Dr. Richard POLLACK and Deborah Pollack, Plaintiffs-Respondents-Cross Appellants,†

v.

David CALIMAG, d/b/a Pain Relief Clinic of Racine, Defendant-Appellant-Cross Respondent.††

.

Court of Appeals

*No. 89-0691. Submitted on briefs February 23, 1990.—Decided June 27, 1990.*

(Also reported in 458 N.W.2d 591.)

† Petition to review denied.

†† Petition to cross-review denied.

On behalf of the defendant-appellant-cross respondent, the cause was submitted on the briefs of *Jeffery R. Brodek* of *DeMark, Kolbe & Brodek, S.C.* of Racine.

On behalf of the plaintiffs-respondents-cross appellants, the cause was submitted on the briefs of *James W. Hill, Thomas M. Devine,* and *Ronald P. Brockman* of *Thompson & Coates, Ltd.* of Racine.

Before Nettesheim, P.J., Brown and Scott, JJ.

SCOTT, J.  Dr. David Calimag, owner of the Pain Relief Clinic of Racine (PRC), appeals the trial court's ruling that the business arrangement between him and Dr. Richard Pollack was a dealership under the Wisconsin Fair Dealership Law (WFDL), ch. 135, Stats. Because the arrangement lacked crucial elements of a dealership, we reverse that portion of the judgment.

Pollack cross appeals, mainly challenging the jury's finding that the parties' covenant not to compete was valid and enforceable. We conclude that the covenant, a reasonable and enforceable one, was breached. We therefore affirm this portion of the judgment. We will address the parties' other issues in the body of the opinion.

## I.  FACTS

Other than the circumstances under which Pollack left PRC, the facts of the case are largely undisputed. PRC is a clinic in Racine, Wisconsin, specializing in the treatment and management of pain. Pollack, an osteopathic physician, began working at PRC in July of 1986. The next month, Calimag, a neurologist, bought the

227

clinic. On December 15, 1986, Pollack and Calimag signed a one-year contract under which Pollack agreed to work at PRC as an independent contractor. The agreement provided that PRC would assign patients to Pollack and also would provide space, medical equipment, support staff and billing services for him. In return, Pollack would pay sixty-five percent of his net collections for those services and facilities.

In January 1987, Pollack and Calimag signed a covenant not to compete. By its terms, Pollack agreed that while in association with PRC and for one year afterward, he would refrain from "compet[ing] with or engag[ing] in the type of business conducted by PRC" within a twenty-mile radius of Racine. Pollack also agreed to refrain from contacting or soliciting former PRC patients for two years after ceasing his association with PRC. Finally, the agreement included a liquidated damages clause under which PRC would receive $25,000 damages plus attorney's fees if Pollack violated the covenant.

Pollack's contract was not renewed when the first term ended on December 15, 1987. Pollack continued working at PRC, however, until December 21. Two days later he filed suit, alleging termination of a dealership without cause.[1] He also sought to have the restrictive covenant declared invalid.

In January of 1988, Pollack joined the practice of the Center for Pain Control in Racine. He worked out of its branch office, however, in Elm Grove, Wisconsin—more than twenty miles from Racine. On February

---

[1]On February 24, 1988, Pollack filed an amended complaint containing five claims and a declaratory judgment action. Claims II and III, seeking compensatory and punitive damages for intentional and fraudulent misrepresentations, were dismissed by summary judgment and are not the subject of this appeal.

24, a Racine shoppers' guide carried an advertisement announcing Pollack's association with the Center for Pain Control, giving both the Racine and Elm Grove addresses. The Elm Grove address was printed beneath Pollack's name, but the ad did not state that Pollack would work in the Elm Grove office only.

On March 9, Calimag filed an amended counterclaim alleging breach of the covenant not to compete. Three months later, he filed a motion for default judgment because Pollack had not answered either the initial or the amended counterclaim. Pollack finally answered the counterclaim on July 15, the day of the default judgment hearing. Calimag's motion for default judgment was denied.

At trial, the jury found that Pollack had breached the covenant and the court assessed $25,000 liquidated damages and attorney's fees in favor of Calimag as stipulated in the agreement. On the dealership claim, the jury awarded Pollack $33,200 on collections for unpaid services and $64,400 for lost earnings through the date of the trial. Pollack was also awarded $20,520 in attorney's fees and costs on the dealership claim.

## II.  THE APPEAL

### A.  Dealership

Prior to trial, the court ruled by summary judgment that the business arrangement between Pollack and Calimag was a dealership within the meaning of WFDL. Neither party now contends that the jury instead should have made that determination. They only dispute whether the court was correct in concluding that their agreement was a dealership arrangement. This presents a question of law which we decide without deference to the trial court's determination. *Bush v. National School*

*Studios, Inc.,* 139 Wis. 2d 635, 645–46, 407 N.W.2d 883, 888 (1987).

"Dealership" is defined in sec. 135.02(3), Stats.:

> "Dealership" means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Thus, for a business relationship to constitute a protected dealership under WFDL, the following criteria must be present: (1) a contract or agreement; (2) by which is granted the right to sell or distribute goods or services or use a trade name or commercial symbol; and (3) in which there is a community of interest. *Id.; see also Bush,* 139 Wis. 2d at 651–52, 407 N.W.2d at 890–91.

The parties agree that a contract exists but disagree whether the other elements exist so as to bring their contractual agreement within the purview of WFDL. We conclude that the Pollack-Calimag agreement was not a dealership because it lacked two of the three characteristics essential to a dealership: the grant of a right to sell or distribute services on PRC's behalf and community of interest. We address each in order.

### 1.  Right to Sell or Distribute PRC's Services

Calimag contends that, rather than a dealership, the relationship was simply an agreement between an independent contractor (Pollack) and a sole proprietor

(Calimag). We agree. The relationship between the doctors was not an arrangement whereby Calimag gave Pollack either a right to sell or distribute goods or services or the right to use PRC's trade name, service mark, logo or other commercial symbol. Calimag did not provide goods or services to Pollack for further delivery to the consumer. On the contrary, Pollack already had his own "goods and services"—his licensed ability to deliver osteopathic services.

Nor was Pollack granted the right to use PRC's name. Pollack himself testified that Calimag did not give him that right. The agreement clarifies, too, that Pollack was never authorized to use PRC's name. It provides:

> Independent Contractor. It is understood and agreed that Pollack is at all times acting and performing as an independent contractor, and not as a servant or agent of PRC . . .. Pollack shall not hold himself out as a partner, shareholder or principal of PRC.

In view of the contract's express language and Pollack's testimony, Pollack's assertion that the contract establishes an "implicit" agreement allowing him to use the PRC service name is unpersuasive.

### 2. Community of Interest

We also conclude that the relationship between Pollack and Calimag did not exhibit a "community of interest." Community of interest is the criterion which most distinguishes dealerships from other forms of business agreements, *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 600, 407 N.W.2d 873, 877 (1987), and implies a significant economic relationship between the parties. *Id.* at 601, 407 N.W.2d at 877. It connotes shared goals and cooperative, coordinated efforts to an extent more

significant than the modicum of shared interests present in every contractual relationship. *Id.* at 604, 407 N.W.2d at 879.

Two closely related guideposts help refine and confine the term so as to make it meaningful. One is a "continuing financial interest," which contemplates a shared financial interest in the operation of the dealership or in the marketing of the good or service. *Id.* at 604, 407 N.W.2d at 878. The other is "interdependence," or the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship. *Id.* at 605, 407 N.W.2d at 879.

In determining whether a community of interest exists, a court should not restrict its inquiry to any one facet of the business relationship. *Id.* Rather, it must examine numerous factors, separately and together, as shown by the actual dealing of the parties and in their contract. *Id.* at 605-06, 407 N.W.2d at 879. Some factors include the length, extent and nature of the parties' dealings and obligations; time or revenue devoted to, and gross proceeds derived from, the product or service; extent and nature of the grant of territory; use of proprietary marks; the alleged dealer's financial investment in inventory, facilities and goodwill; and expenditures by the alleged dealer for advertising or supplementary services. *Id.* at 606, 407 N.W.2d at 879-80.

Calimag contends a full analysis of the *Ziegler* factors demonstrates the lack of a community of interest. He argues that the trial court erred by considering only two factors—Pollack's investment in good will during his year association with PRC and the payment arrangement under which Pollack paid sixty-five percent of his charges to PRC for staff and office support.

Pollack, on the other hand, contends that the arrangement evinced a community of interest through its shared goals and cooperative efforts, shown by the contractual division of duties and the common purpose of providing medical services; and through the parties' "financial interdependence," shown by their 65/35 division of net receipts and by the covenant not to compete which restricted Pollack from practicing competitively in the Racine area.

We agree with Calimag that it is necessary to examine the totality of the circumstances in determining whether a community of interest is present. *Id.* at 605–06, 407 N.W.2d at 879. After examining the pertinent factors, we conclude that Pollack and PRC did not share a community of interest.

The Pollack-Calimag business relationship was of relatively short duration, lasting only one year. Pollack made no financial investment in PRC and had no continuing financial obligations after he left. Although he claims to have devoted 100% of his time to distributing PRC's services, as an independent contractor the services he dispensed were in reality his own. The contract provided that Pollack would be paid 100% of net collections. Of that amount, he paid 65% for the clinic's facilities, staff and services. Consequently, Pollack did not derive profit from PRC's profits; PRC derived its profit from Pollack's. Pollack bore none of the financial responsibility for advertising or ancillary services such as laboratory or x-ray equipment.

In addition, we reject Pollack's argument that the restrictive covenant represents the financial investment contemplated under WFDL. First, the $250 consideration was paid by Calimag to Pollack, not vice versa. Secondly, every business relationship reasonably contemplates that the parties will seek to build good will.

The noncompete agreement protected PRC's good will, not Pollack's. By entering into an agreement not to usurp the clinic's accruing good will, Pollack is now foreclosed from arguing that the same agreement represents his "investment."

We further reject this argument because, as part of his defense to Calimag's counterclaim, Pollack sought to void the noncompete agreement. Yet, here he argues that the agreement represents his investment in the business. This inconsistent position presents a classic case of judicial estoppel. *State v. Washington,* 142 Wis. 2d 630, 635, 419 N.W.2d 275, 277 (Ct. App. 1987). He cannot urge enforcement of the agreement on the one hand as a basis for sustaining his dealership argument and, on the other hand, urge us to invalidate it as a defense to the counterclaim.

■
There is no question but that the agreement between Pollack and Calimag constituted an economic arrangement. As with any such arrangement, there are some mutual goals, with profit for one translating into profit for the other. We do not believe, however, that merely sharing some common goals, financial or otherwise, is enough to satisfy the "continuing financial interest" and "interdependence" guideposts so as to elevate this relationship to the level of "community of interest." *See Ziegler,* 139 Wis. 2d at 604, 407 N.W.2d at 879. We therefore reverse the portion of the judgment holding that the business arrangement between Pollack and Calimag was a dealership. Consequently, we reverse the damages and attorney's fees awarded to Pollack on the dealership claim.

## B. Default Judgment

The next issue is whether the trial court properly denied Calimag's motion for default judgment. Default judgments are governed by sec. 806.02, Stats. That statute provides that the *plaintiff* may move for judgment according to the demand of the complaint. Sec. 806.02(2). The statute addressing counterclaims, sec. 802.07, Stats., gives no indication that the appellations "plaintiff" and "defendant" may be reversed for purposes of a counterclaim. We make no comment on the logic of a rule limiting default judgment to a plaintiff. But where, as here, the statutory language is unambiguous, we are bound by it and changes in it are for the legislature, not this court. We therefore affirm the trial court's denial of the motion.

## C. Frivolous Claim

The third issue is whether the trial court properly denied Calimag's frivolous claim motion. Pollack had sought an order pursuant to sec. 146.83, Stats., directing Calimag to notify patients of Pollack's changed status. The trial court dismissed the claim but refused to find it frivolous under sec. 814.025, Stats. We disagree.

Section 146.83, Stats., is a patient's rights statute ensuring patients access to their health care records. We do not imply, and Calimag does not contend, that the claim was asserted in bad faith. *See* sec. 814.025(3)(a), Stats. Pollack advances no argument, good faith or otherwise, as to how sec. 146.83 possibly could be interpreted to support his claim. Furthermore, Pollack should have known there is no reasonable basis in law or equity for the claim because no possible reading of the statute

235

embraces an action by one physician against another. *See* sec. 814.025(3)(b). This claim is frivolous; we therefore remand for a determination of costs and reasonable attorney's fees to be awarded to Calimag. *See* sec. 814.025(1).

## III. CROSS-APPEAL

### A. Violation of Covenant Not to Compete

Pollack first argues that the court erred in affirming the jury's finding that the covenant not to compete was violated because there was no testimony showing that he either competed directly or associated with a PRC competitor.

The advertisement taken out in the "Pennysaver," the Racine area shoppers' guide, plainly refutes this claim. It announced Pollack's association with the Center for Pain Control. That facility is located in Racine and Elm Grove and offers the same type of treatment as PRC provides. The finding is not clearly erroneous.

### B. Validity of Covenant Not to Compete

Pollack next contends that, in any event, the covenant not to compete was void under sec. 103.465, Stats., because the agreement was not "reasonably necessary for the protection of the employer or principal." *Id.* We disagree.

We must make five distinct inquiries in evaluating the enforceability of a covenant not to compete. *Fields Found., Ltd. v. Christensen,* 103 Wis. 2d 465, 470, 309 N.W.2d 125, 128 (Ct. App. 1981). The covenant must:

(1) be necessary for the protection of the employer or principal; (2) provide a reasonable time restriction; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive to the employee; and (5) not be contrary to public policy. *Id.* We conclude that the Pollack-Calimag agreement survives all five inquiries and is therefore enforceable.

We first examine whether the covenant is necessary for Calimag's protection. While a principal is not entitled to protection from "legitimate and ordinary competition of the type that a stranger could give," reasonable restraint is permissible if the employee presents "a substantial risk either to the employer's relationships with his customers or with respect to confidential business information." *Id.* at 471, 309 N.W.2d at 129.

The purpose of a covenant not to compete is to prevent for a time the competitive use of information or contacts gained as a result of the departing agent's association with the principal. *Chuck Wagon Catering, Inc. v. Raduege,* 88 Wis. 2d 740, 751, 277 N.W.2d 787, 792 (1979). In many businesses the relationship with customers is the most valuable asset of the enterprise. *Id.*

Here, Calimag paid $118,000 for the good will of PRC when he purchased it in 1987. Pollack, the clinic's only full-time physician, was also its biggest producer. PRC expended considerable time, effort and advertising to generate new patients, most of whom were referred to Pollack. PRC's substantial effort and training contributed to Pollack's becoming an expert in pain management. It is reasonable to believe that many of PRC's patients considered themselves Pollack's patients and likely would have followed him to a new location. Furthermore, PRC's billing system gave Pollack full access to extensive patient lists. The protection of a business's stock of customers is a legitimate interest of the

employer. *Id.* at 753, 277 N.W.2d at 792. Calimag clearly had a protectable interest.

Our second inquiry is whether the imposed time restriction is reasonable. Reasonableness "depends upon the period of time required to obliterate in the minds of the . . . customers the identification formed during the period of the . . . employment." *Fields Found.,* 103 Wis. 2d at 479, 309 N.W.2d at 133. Two-year restraints generally are considered reasonable in Wisconsin. *Chuck Wagon,* 88 Wis. 2d at 754, 277 N.W.2d at 793.

The covenant here provided that for one year after his association with PRC ended, Pollack would not engage in a competing business within a twenty-mile radius of PRC. It also forbade Pollack from soliciting PRC patients for a period of two years. The evidence showed that PRC patients received relatively long-term therapy and rehabilitation for the treatment of chronic pain. Pollack testified that he was popular with the patients. Given his close identification with PRC, the time restrictions were reasonable. *See Fields Found.,* 103 Wis. 2d at 479, 309 N.W.2d at 133.

The reasonableness of the twenty-mile territorial limitation is our third area of inquiry. A covenant's geographic restraint is reasonable if it is limited to the area actually served. *Chuck Wagon,* 88 Wis. 2d at 754, 277 N.W.2d at 793. The evidence showed that while the bulk of PRC's patients lived within five to seven miles of the clinic, advertising generated numerous patients from within a twenty-mile radius of Racine. Thus, the limitation to which Pollack agreed bears a reasonable relation to PRC's business. *See Fields Found.,* 103 Wis. 2d at 479, 309 N.W.2d at 132.

Next we examine whether the covenant is unduly harsh or oppressive to Pollack. It is not. Pollack is an osteopath licensed by the state. The agreement does not

affect his right to practice general medicine wherever and whenever he chooses. If he desires to continue in the specialized treatment of chronic pain, he immediately may do so—outside the twenty-mile radius. From there, he may treat anyone, including PRC patients who reside within twenty miles of PRC, as long as he does not *solicit* PRC patients for two years.

Finally, the agreement is not contrary to public policy. Agreements between physicians not to enter competitive practice within a reasonable time and distance are not disfavored in general. *Oudenhoven v. Nishioka,* 52 Wis. 2d 503, 505, 190 N.W.2d 920, 921 (1971). Nor did this one in particular create a shortage of workers in the type of service, eliminate competition or create a monopoly. *See Chuck Wagon,* 88 Wis. 2d at 755, 277 N.W.2d at 793. The evidence showed that several other doctors of osteopathy practiced in the Racine area. In fact, the Center for Pain Control itself was only a mile from PRC.

## C.   Validity of Stipulated Damages Clause

The covenant not to compete required Pollack to pay PRC $25,000 for breach of the agreement and reasonable attorney's fees incurred in its enforcement. The trial court upheld the liquidated damages clause as reasonable. Pollack argues that the stipulated damages are grossly in excess of the actual damages, making the damages clause penal and therefore unenforceable. *See Fields Found.,* 103 Wis. 2d at 475, 309 N.W.2d at 130–31. We disagree.

On review of the validity of a stipulated damages clause, we uphold the factual determinations underlying the legal conclusion unless they are clearly erroneous.

*Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357, 361 (1983). Whether those facts fulfill the legal standard of reasonableness, however, is a question of law. *Id.* While such questions usually call for *de novo* review, in this instance we must give some deference—though not controlling weight—to the trial court because its determination of reasonableness is so closely intertwined with the facts supporting that ruling. *Id.*

The overall single test of validity is whether the clause is reasonable under the totality of the circumstances. *Id.* at 526, 331 N.W.2d at 361. This test strikes a balance between two competing policies: the parties' freedom to contract and the public's interest in preventing abuse. *Id.* at 529, 331 N.W.2d at 362.

Several factors help determine the reasonableness of a particular clause: whether the parties intended to provide for damages or a penalty; whether the injury is capable of accurate estimation at time of contract; and whether the stipulated damages are a reasonable forecast of the likely harm. *Id.* at 529-30, 331 N.W.2d at 362-63. The first factor, subjective intent, is the least important in determining the objective reasonableness of a stipulated damages clause. *See id.* at 530, 331 N.W.2d at 363. Regarding the second factor—"ease of ascertainment"—the greater the difficulty of estimating damages, the more likely the stipulated damages will appear reasonable. *Id.* at 530-31, 331 N.W.2d at 363. As to the third factor, reasonable forecast of harm, if the damages provided for in the contract are in proportion to the actual harm sustained, the parties' original expectations likely will be found to be reasonable. *See id.* at 532, 331 N.W.2d at 364.

With this in mind, we consider the $25,000 stipulated damages clause of the Pollack-Calimag agreement. The language of the covenant illustrates the parties' intent that the $25,000 represented damages rather than a penalty. Paragraph two of the agreement states:

> PRC and Pollack acknowledge that the list of PRC's patients, and the goodwill and continued business of those patients is a unique and valuable asset of PRC, and that PRC would be irreparably damaged if Pollack were to engage in competition with PRC.

Moreover, two prior drafts of the covenant were introduced to show that Calimag had originally proposed $200,000 as stipulated damages. Pollack successfully negotiated that amount down to $25,000, about 18% of his annual salary.

Next, we assess the parties' ability to accurately predetermine damages should Pollack impermissibly compete with PRC. The difficulty of an advance determination is apparent. For instance, it was unknowable at the time of contracting how many established patients might follow Pollack to a competitor or how many potential ones might be lost.

Finally, we compare the stipulated damages with the actual harm. Pollack testified that he saw ten to fifteen of his PRC patients after beginning work with the Center for Pain Control. Norbert Chicon, PRC's business manager, testified that a typical patient averaged ten visits at an approximate total cost of $1,435. Thus, on these patients alone, PRC actually lost between $14,350 and $21,525. In addition, Chicon also testified that, comparing the first eight months of 1988 with the first eight months of 1987, there were 3,000 fewer patient visits and a decline in clinic revenues of $210,000.

Considering the totality of the circumstances—including Pollack's $140,000 income from PRC, the express language of the covenant, Pollack's treatment of his ex-patients while associated with a PRC competitor and PRC's actual losses related to Pollack's departure—we conclude the $25,000 liquidated damages called for in the agreement was neither unreasonable nor penal. We affirm the judgment both as to the stipulated damages and the costs and attorney's fees expended in the covenant's enforcement.

## D.  Jury Determination of Lost Earnings

Pollack next challenges the computation of his lost earnings, determined by the jury to be $64,400. He contends his future lost profits, shown to be $25,680, should have been included in the award. Having reversed the trial court's determination that a dealership existed, however, we also reverse the jury's findings of damages pursuant to that claim. Accordingly, we need not address whether further damages might have been proper had Pollack prevailed on the dealership claim.

## E.  Prejudgment Interest

The jury awarded Pollack $33,200 on his accounts receivable. The trial court denied prejudgment interest on it because the damages were not liquidated. Pollack argues that the amount owing to him was readily determinable and that the trial court therefore erred in denying prejudgment interest on it. We agree.

Prejudgment interest is available when damages are either liquidated or measurable against a reasonably certain standard. *Loehrke v. Wanta Builders, Inc.,* 151 Wis.

2d 695, 706, 445 N.W.2d 717, 722 (Ct. App. 1989). Whether it may be awarded is a question of law. *Id.*

The record supports Pollack's contention that his damages on his accounts receivable are readily determinable. PRC used a bimonthly billing and collection system. The Pollack-Calimag agreement provided for Pollack to be paid 35% of all collections, as, in fact, he was throughout his year at PRC. Evidence was introduced showing the accounts receivable creditable to Pollack were ascertainable at any given time after his departure. PRC owed 35% of those amounts to Pollack. PRC could have avoided liability for interest on those determinable damages simply by tendering to Pollack a sum equal to the amount of damages as collections were made. *See id.* at 706-07, 445 N.W.2d at 722. Consequently, we affirm the jury verdict of $33,200 but remand the matter to the trial court for a determination of prejudgment interest.

No costs to either party.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded with directions.