BAKKE CHIROPRACTIC CLINIC, S.C.; Christianson Chiropractic, S.C.; and Brad J. Smith, D.C., Plaintiffs-Appellants, †

v.

PHYSICIANS PLUS INSURANCE CORPORATION, Defendant-Respondent.

Court of Appeals

*No. 97–1169. Submitted on briefs October 20, 1997.—Decided December 11, 1997.*

(Also reported in 573 N.W.2d 542.)

† Petition to review denied.

606

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Jon P. Axelrod* and

*Steven J. Kirschner* of *Dewitt, Ross & Stevens, S.C.;* *Brian E. Butler* and *Kevin S. Thompson* of *Stafford, Rosenbaum, Rieser & Hansen;* and *Thomas P. Godar* and *Amy O. Bruchs* of *Michael, Best & Friedrich,* all of Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Richard L. Bolton* and *Paul R. Norman* of *Boardman, Suhr, Curry & Field* of Madison.

Before Dykman, P.J., Deininger and Nettesheim, JJ.

DEININGER, J. Bakke Chiropractic Clinic, Christianson Chiropractic and Brad J. Smith, D.C., (the providers) commenced separate actions seeking to enjoin Physicians Plus Insurance Corporation (PPIC) from terminating its contractual relationship with each of them. The trial court granted PPIC's motion for summary judgment and dismissed the providers' complaints. The providers claim the trial court erred in determining that the Wisconsin Fair Dealership Law (WFDL) did not apply to their contractual arrangements with PPIC. As did the trial court, we conclude that the WFDL does not apply on the present facts. We therefore affirm the order.

## BACKGROUND

Physicians Plus Insurance Corporation (PPIC) is a health maintenance organization (HMO) insurer. *See* Chapter 609, STATS. HMO insurers must make "comprehensive health care services performed by providers selected by the [HMO]" available to enrolled participants, in exchange for predetermined periodic fixed payments from the participants. Section

609.01(2), STATS. In 1987, the Wisconsin Legislature enacted measures that required HMOs and other health insurers doing business in Wisconsin to cover chiropractic services. Sections 609.70 and 632.87(3), STATS. Prior to 1997, PPIC met this requirement by entering into provider agreements directly with independent chiropractors and chiropractic clinics, including the three plaintiffs in this litigation.

Under these agreements, the provider was required to provide chiropractic services to PPIC members, and PPIC paid the provider based on a compensation formula set forth in the provider agreement. The compensation formulas varied from contract to contract, and providers were paid on either a "fee for service" basis or a "capitated fee" basis. Under "fee for service," PPIC paid the provider a specified percentage of the provider's "billed charges" for each service performed. Under a "capitated fee" formula, the provider received a fixed amount per PPIC member each month, regardless of the amount of services provided to PPIC members. Under either payment method, the providers were not allowed to seek payment for services from PPIC members unless the member's insurance contract with PPIC called for member co-payments or deductible payments.

The providers are licensed under Chapter 446, STATS., to provide chiropractic services. Each maintains one or more chiropractic clinics within the PPIC service area and provides chiropractic services to both PPIC members and non-members at those clinics. PPIC's contracts with the providers began in 1987–89 and continued through 1996. Each provider agreement allowed for termination without cause by either party upon ninety days prior notice to the non-terminating party.

After discovering that its costs for providing chiropractic services exceeded norms for similar HMO insurers by some seventy-seven percent, PPIC decided to change the way it procured chiropractic services for its members. On December 27, 1996, PPIC gave ninety-day termination notices to all of its chiropractic providers. Instead of contracting directly with individual chiropractic providers, PPIC opted to contract with a chiropractic management company, ChiroTech, which agreed to obtain chiropractic services for PPIC members. PPIC agreed to pay ChiroTech on a capitated fee basis for making chiropractic services available to PPIC members. ChiroTech, in turn, entered into provider agreements with chiropractic providers, who were to be compensated according to compensation formulas agreed to by ChiroTech and each provider. ChiroTech offered each existing PPIC chiropractic provider a new provider agreement under which the provider would continue to provide chiropractic services to PPIC members. Some nineteen chiropractic providers accepted ChiroTech proposals, but each of the plaintiff providers rejected contracts with ChiroTech due to the significantly lower compensation offered for their services.

All of the plaintiff providers have had relationships with PPIC for at least eight years. All three experienced growth in their respective chiropractic practices over the duration of their relationships with PPIC, due in large part to the number of PPIC members treated at their facilities. Each provider claims to have relied on the continuing relationship with PPIC when making investments in new facilities, deciding on clinic locations or hiring additional staff. Specifically, Bakke claims that due to

its relationship with PPIC, it expanded its DeForest clinic, employed three new chiropractors, and opened offices in Sun Prairie and Waunakee. Smith claims that instead of locating his practice in McFarland as he originally planned, he located in Madison at the prompting of PPIC, a location which cost him significantly more than the McFarland site. Christianson claims to have purchased existing practices in Spring Green and Mazomanie, bought new equipment, hired additional chiropractors and staff, and committed itself to building a new office building in Mazomanie, all because of its provider contract with PPIC. None of the providers claims, however, that any specific location or personnel are devoted exclusively to providing care for PPIC members, nor is there any evidence that PPIC coerced the providers into making these financial commitments.

In order to prevent PPIC from terminating the provider agreements, each provider filed a complaint in the circuit court seeking an injunction, declaratory judgment and damages against PPIC. The trial court consolidated the three cases. After concluding that the WFDL did not apply to the relationships in question, the court granted PPIC's motion for summary judgment and ordered the providers' complaints dismissed. The providers appeal the order dismissing their complaints.

## ANALYSIS

*a.  Standard of Review*

■

The parties stipulated in the trial court that there were no material facts in dispute and that disposition on summary judgment was appropriate. The only

dispute, therefore, is whether the trial court was correct in concluding that the WFDL does not apply to the agreements between the providers and PPIC. The application of the WFDL to undisputed facts involves a question of law which we decide de novo. *Bush v. National School Studios, Inc.*, 139 Wis. 2d 635, 646, 407 N.W.2d 883, 888 (1987).

### b. *The Wisconsin Fair Dealership Law*

In .1974, the Wisconsin legislature enacted the WFDL to "protect dealers against unfair treatment by grantors." Section 135.025(2)(b), STATS. A "grantor" is an entity that grants a "dealership" to a "dealer." Sections 135.02(2) and (5), STATS. The statute prohibits a grantor from terminating, canceling, failing to renew or substantially changing the competitive circumstances of a dealership agreement without good cause. Section 135.03, STATS. If a grantor violates the WFDL, the dealer may seek damages and injunctive relief. Section 135.06, STATS.

The most frequently litigated issue regarding the WFDL is whether a specific business relationship falls within the WFDL's definition of "dealership." *Bush,* 139 Wis. 2d at 646, 407 N.W.2d at 888. In attempting to answer this question, a court must employ "a definition sufficiently broad to encompass non-traditional business relationships which in fact fall under the dealership rubric, yet restrictive enough to avoid 'including every vendor/vendee relationship under the protective veil of ch. 135.' " *Id.* (quoted source omitted).

The providers contend that their agreements with PPIC created "dealerships" under § 135.02(3), STATS.[1]

---

[1] "Dealership" is defined in § 135.02(3), STATS., as follows:

To constitute a "dealership," all three of the following elements must exist: (1) a contract or agreement; (2) which grants the right to sell or distribute goods or services, or which grants the right to use a trade name, logo, advertising or other commercial symbol; and (3) a community of interest in the business of offering, selling or distributing goods or services. *See Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 763, 300 N.W.2d 63, 70 (1981).

The parties agree that contracts existed between PPIC and each provider. They dispute, however, whether the provider agreements met the remaining two criteria necessary to trigger the protections of the WFDL. We conclude that the contractual relationships between the individual providers and PPIC did not constitute dealerships within the meaning of the WFDL because the provider agreements did not satisfy the second criterion for a dealership: the agreements did not grant the right to sell or distribute goods or services, or the right to use a trade name, logo, advertising or other commercial symbol.

## (1) Right to Sell Goods or Services

The providers contend that their provider agreements with PPIC granted them the right to sell chiropractic services to PPIC members, and that without these agreements they "would have had no access to [PPIC] members." We disagree. The providers

"Dealership" means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in 'which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

had the right to sell their chiropractic services to PPIC members prior to signing provider agreements with PPIC, and they continue to have that right following PPIC's termination of the agreements.

We agree with PPIC's characterization of the provider agreements as contracts for the "bulk sale" of chiropractic services by the providers to PPIC, which purchased those services to fulfill its obligation as an HMO insurer to provide chiropractic care for its members. The relationship between PPIC and the providers is very much like the one described in *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 300 N.W.2d 63 (1981). There, an air freight forwarder, in order to provide its customers with door-to-door service, purchased pick-up and delivery services from a local cartage company. The contractual arrangement between Airborne and Kania, the local carrier, was held to be outside the WFDL for lack of a "community of interest," the third element of a dealership. *Id.* at 776, 300 N.W.2d at 76. In its analysis, however, the supreme court noted that Airborne had hired Kania to provide services to Airborne, not to sell or distribute Airborne's services to others. *Id.* at 770, 300 N.W.2d at 73. The providers here, like the cartage company in *Kania*, are "non-agent, non-employee independent contractor[s]," who perform a service for PPIC. *See id.* at 758, 300 N.W.2d at 68. The service here is neither sold directly to PPIC's customers nor billed to them, for the providers are paid on a regular basis by PPIC at a set rate determined by their contracts, independent of PPIC's billings to and payments from its members. *See id.*

The providers contend, no doubt correctly, that if their provider agreements with PPIC are terminated, PPIC members will be reluctant to seek chiropractic

services from them since the same services from other chiropractors are covered under the members' insurance plans with PPIC. The fact that PPIC members choose to enroll in PPIC instead of purchasing chiropractic services directly from these providers, however, does not alter the fact that the providers retain their right to sell their professional services to whomever they wish, including PPIC members, without any grant of authority from PPIC.

The providers rely heavily on the holding in *Bush v. National School Studios, Inc.,* 139 Wis. 2d 635, 407 N.W.2d 883 (1987), to support their argument that their agreements with PPIC granted them the right to sell services under the WFDL. Bush was employed by National School Studios, a company engaged in the school photography business. Bush was the sole manager of National's northern Wisconsin territory. *Id.* at 638, 407 N.W.2d at 885. Bush had paid $150,000 for the right to the territory and, under his employment contract, was required to work exclusively for National; actively solicit business for National; purchase necessary supplies to carry on the business; and promote the business by paying for half of the advertising costs. *Id.* at 638–39, 407 N.W.2d at 885. Bush received a commission equal to forty percent of National's net sales in his territory. *Id.* at 639, 407 N.W.2d at 885. Bush also prominently used and displayed the National name and logo. *Id.* The court described Bush's duties and his relationship with National as follows:

> Once a school booked National's service through Bush he scheduled the picture taking sessions, sent notices and order forms to parents and set the price on the portrait packages. Bush had substantial latitude to set the prices on these

packages[;] . . . accepted student orders, photographed the students and collected payment[;] . . . extended [the students] credit[; and] . . . mailed the exposed film to National which processed, packaged and distributed the finished portraits to the schools. Bush also remitted all funds collected from portrait package sales to National by depositing them in its bank account.

*Id.* at 640, 407 N.W.2d at 885–86. The court in *Bush* concluded that Bush was "granted the right to sell National's services" and was a dealer within the meaning of the WFDL. *Id.* at 654, 407 N.W.2d at 891.

The present facts are much different than those in *Bush*. Even though Bush performed numerous services for National, all of his efforts were directed toward selling National's products and services to the public. Here, the providers sell only their own chiropractic services, to PPIC and to others. The providers have no obligation to promote, sell or distribute PPIC's product, which is health insurance coverage. Additionally, unlike Bush, the providers' compensation for services is not tied to PPIC's receipts generated by providers' efforts. Payments under the provider agreements are based on services performed by a provider, or on PPIC member enrollments, not on the amount of premium revenues collected by PPIC. In short, Bush was under contract to sell National to the public, while the providers have contracted to sell themselves to PPIC.

We agree with PPIC that the providers here are more similarly situated to the plaintiff in *Pollack v. Calimag,* 157 Wis. 2d 222, 458 N.W.2d 591 (Ct. App. 1990), than they are to the plaintiff in *Bush*. Pollack was an osteopathic physician who had signed a contract with Calimag to work at Calimag's clinic, the "PRC," as an independent contractor. Under the

616

agreement, PRC was to assign patients to Pollack as well as provide him with space, medical equipment, support staff and billing services. In return, PRC would receive sixty-five percent of Pollack's net collections. *Id.* at 228, 458 N.W.2d at 595. After Calimag failed to renew the contract, Pollack sued for wrongful termination without cause under the WFDL. We rejected Pollack's WFDL claim after determining "the right to sell or distribute goods or services" was absent in the relationship because Pollack was selling or distributing his own medical services:

> The relationship between the doctors was not an arrangement whereby Calimag gave Pollack either a right to sell or distribute goods or services or the right to use PRC's trade name, service mark, logo or other commercial symbol. Calimag did not provide goods or services to Pollack for further delivery to the consumer. On the contrary, Pollack already had his own 'goods and services'—his licensed ability to deliver osteopathic services.

*Id.* at 231, 458 N.W.2d at 596.

The providers here did not deliver PPIC's goods or services to the insurer's members; they, like Pollack, provided their own "licensed ability to deliver [chiropractic] services." PPIC and the providers entered into contracts under which each provider acted as an independent contractor in providing health care services to third parties, PPIC members. PPIC had little or no involvement in supervising the providers' performance of chiropractic services. PPIC did not provide them with office space, equipment or support staff. It is thus even more evident here than in *Pollack* that the providers were independently providing their own services, not those of the alleged grantor.

617

The providers attempt to distinguish *Pollack* by noting that PPIC has a "legal duty to make chiropractic services available to its members," unlike Dr. Calimag, who had no duty to provide osteopathic services to patients of his clinic. However, the fact that PPIC is legally mandated to make chiropractic services available to its members does not alter the relationship between the parties. As we have discussed above, PPIC is a purchaser of professional services that originate with and are independently rendered by the providers. The statutory requirement that all health insurers in Wisconsin, including HMOs like PPIC, must provide chiropractic coverage does not convert chiropractic services into services of the insurers. We agree with the trial court when it commented that "while [the statutory mandate] is a factual distinction, it is not one that informs the question as to the nature of the relationship between the service purchaser [PPIC] and the service provider."

For the foregoing reasons, we conclude that PPIC granted the providers no "right to sell" any goods or services within the meaning of § 135.02(3), STATS. Rather, under its agreements with the providers, PPIC was a purchaser of professional services which the providers were licensed to provide to PPIC members and to others. *Cf. McEvoy v. Group Health Cooperative of Eau Claire*, 213 Wis. 2d 507, 523, 570 N.W.2d 397, 404 (1997) (HMOs are deemed to be health insurers for purposes of tort liability when making out-of-network benefit decisions); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 924–26 (1st Cir. 1984) (health insurer that pays for medical services for its insureds may be treated "as itself the purchaser of the doctors' services" for purposes of antitrust analysis); *Blue Cross and Blue*

*Shield United of Wis. v. Marshfield Clinic,* 65 F.3d 1406, 1414–15 (7th Cir. 1995), *cert. denied,* 116 S. Ct. 1288 (1996) (health insurer may be viewed as "purchaser of medical services" when analyzing a standing issue).

### (2) *Right to Distribute Goods or Services*

The providers argue that even if the provider agreements did not grant them a right to sell services, it did grant them the right to distribute chiropractic services to PPIC members, and hence a dealership was established. As we have noted, however, PPIC does not produce chiropractic services; it produces and sells health insurance coverage. The providers do not claim, nor can they, that they were engaged in distributing PPIC's health insurance plans. Thus, the providers are in a much different position than that of the plaintiff in *Satellite Receivers, Ltd. v. Household Bank (Illinois) N.A.,* 922 F.Supp 174 (E.D. Wis. 1996), who was found to be a grantee of the right to distribute the grantor's service. Satellite and Household entered into a contract creating a private-label credit card financing program which Satellite offered to prospective customers interested in buying satellite receiving equipment. The agreement allowed Satellite to offer the credit card, financed by Household, which Satellite's customers could then use to purchase equipment from Satellite. Satellite provided the credit card applications to customers and forwarded the applications to Household for approval. When Household terminated its agreement with Satellite, the court held Satellite was a dealer because it had the right "to distribute Household's financial services." *Id.* at 178.

We conclude that, with respect to the distribution of services, the providers and PPIC are more easily viewed as performing roles that are precisely reversed from those alleged by the providers. The providers produce and sell chiropractic services, and they arguably have retained PPIC as their "dealer" to distribute those services. PPIC combines the providers' services with those of other health care providers, and then distributes the package to the ultimate consumers of health care services, PPIC members. PPIC earns its "commission" for distributing the providers' services by collecting premiums that presumably exceed in the aggregate PPIC's payments to all providers. Thus, it is PPIC that occupies a position analogous to the satellite equipment seller in *Satellite Receivers*. It offers the providers' chiropractic services to its members, in much the same way that the contract in *Satellite Receivers* allowed Satellite to offer Household's financial services to Satellite's customers. *Id.*

We conclude, therefore, that the provider agreements did not grant the providers a right to distribute goods or services any more than it did a right to sell them.

### (3) Right to Use PPIC's Trade Name or Symbol

PPIC's agreements with the providers included the following provision:

> 8. *Trade Names*. Provider consents to the use of its name, address(es), telephone number(s), list of health professionals, and list of services in any advertisements or other materials prepared by PPI C. Provider may use PPIC's name for the purpose of identifying Provider as a Participating Provider for

PPIC. Except as set forth in this section, no license or right is granted by either party, whether expressly or by implication, to the other party to use any trade name, trademark, or service mark owned or controlled by that party, without the prior written consent of that party.

Bakke Clinic submitted copies of numerous advertisements it had placed since 1993 which included the designation "Provider for Physicians Plus HMO," together with the PPIC logo. Additionally, Bakke included the PPIC-provider designation in its yellow pages listing and on signs at its clinics. Christianson also incorporated the PPIC-provider designation into its yellow pages ads and had the designation on the door of its Spring Green clinic. Dr. Smith displayed the PPIC-provider designation and logo on the door and on the counter of his office.

The providers thus contend that they have been granted the right to "use a trade name, trademark, service mark, logotype, advertising or other commercial symbol" under § 135.02(3), STATS. The trial court concluded that there were two problems with the providers' argument: "First, the contractual entitlement is a limited one" and "[s]econd, the case law appears to require something more than a mere identification with a grantor." We agree with the trial court on both points.

The provider agreements allow, but do not require, a provider to "use PPIC's name for the purpose of identifying Provider as a Participating Provider for PPIC," and nothing more. The agreements specifically disavow the grant of any "license or right . . . expressly or by implication . . . to use any trade name, trademark or service mark owned or controlled by [either] party, without the prior written consent of that party." This

limited contractual entitlement to use the PPIC-provider designation does not suggest an effort to associate the providers with a particular product or service. Rather, the allowed use of the PPIC-provider designation appears to be intended solely for the convenience of PPIC members. Use of the designation by providers informs PPIC members of the availability of covered services, similar to announcements such as "we accept medical assistance," or "Mastercard accepted."

Coverage under the WFDL based upon a grant of trade name usage requires more than the mere use of a logo to identify one entity as being affiliated with another entity. *See Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis. 2d 17, 29–31, 313 N.W.2d 60, 66–67 (1981). In *Foerster*, the plaintiff had been retained by Atlas Metal to act as a "manufacturer's representative" to help promote the sale of Atlas products. *Id.* at 19–20, 313 N.W.2d at 61. Atlas provided Foerster with business calling cards containing its name and logo and some brochures advertising its products. *Id.* at 29, 313 N.W.2d at 66. Foerster, like the providers here, used the logo "only for the purpose of informing potential clients of his status," *id.* at 30, 313 N.W.2d at 66, and was under no obligation "to expend any money for advertising." *Id.* at 20, 313 N.W.2d at 61. The supreme court noted that "[t]his extremely limited use of the Atlas name and trademark differs considerably from the use made of the grantor's trademark in the typical 'dealership' intended by the legislation." *Id.* at 29, 313 N.W.2d at 66.[2]

---

[2] The supreme court has subsequently disavowed an interpretation of *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis. 2d 17, 29-31, 313 N.W.2d 60, 66-67 (1981), that would require a

■ We conclude that, in order to qualify the providers as dealers under Chapter 135, STATS., a much more expansive grant of the right to use PPIC's trade name and logo is required than the limited provider identification right contained in the provider agreements. The fact that the providers are permitted to identify themselves as PPIC providers may show some interdependence for purposes of a community of interest analysis, *see Guderjohn v. Loewen-America, Inc.*, 179 Wis. 2d 201, 211, 507 N.W.2d 115, 120 (Ct. App. 1993), but that limited use, absent any grant of rights to either sell or distribute goods or services, is insufficient to meet the requirements for coverage under the WFDL.

## (4) Community of Interest

The trial court concluded that the provider agreements also failed the third definitional criterion for a dealership because there was no community of interest between PPIC and the providers in the business of offering, selling or distributing goods or services. *See Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 407 N.W.2d 873 (1987); *and Pollack v. Calimag,* 157 Wis. 2d 222, 231–34, 458 N.W.2d 591, 596–98 (Ct. App. 1990). While we do not disagree with the result reached by the trial court in its analysis of the third

"rigid, exclusive percentage test" regarding business revenues in determining whether a community of interest exists. *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 603, 407 N.W.2d 873, 878 (1987). We conclude, however, that the analysis in *Foerster* of the "right to use trade name" criterion remains good law. *See Bush v. National School Studios, Inc.*, 139 Wis. 2d 635, 654, 407 N.W.2d 883, 891 (1987) (citing *Foerster* in an analysis of the second dealership criterion).

criterion, it is unnecessary for us to independently address community of interest since we have concluded that the provider agreements failed on the second of the three requirements for coverage under the WFDL. *See Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 776, 300 N.W.2d 63, 76 (1981) (where a relationship fails to meet one element of "dealership" definition, court need not address other elements).

### c. *PPIC's Alternative Arguments*

PPIC also argues that if its provider agreements are held to create dealerships under § 135.02(3), STATS., it is nonetheless exempt from coverage under the WFDL by virtue of § 135.07(2), STATS., which provides that the WFDL does not apply "[t]o the insurance business." Finally, PPIC claims that application of the WFDL to PPIC's employee health benefit plans is preempted by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(a). Because we conclude that the provider agreements did not establish dealerships under § 135.02(3), STATS., it is unnecessary for us to address PPIC's alternative arguments.

### CONCLUSION

The WFDL does not apply to the agreements between PPIC and the providers because those agreements did not grant "the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol," as is required to establish a dealership under § 135.02(3), STATS.

*By the Court.*—Order affirmed.