# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP2366 |
| COMPLETE TITLE: | |

Thomas F. Benson, Mark Rechlicz, Mark Rechlicz
Enterprises, Inc., Robert J. Muranyi, RJM Pro
Golf Incorporation and William J. Scheer,
          Plaintiffs-Appellants-Petitioners,
     v.
City of Madison,
          Defendant-Respondent.

REVIEW OF A DECISION OF THE COURT OF APPEALS
371 Wis. 2d 760, 886 N.W.2d 593
(2016 - Unpublished)

| | |
|---|---|
| OPINION FILED: | June 22, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 19, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Richard G. Niess |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | KELLY, J. concurs |
| DISSENTED: | ABRAHAMSON, J. dissents, joined by A.W. BRADLEY J. |
| NOT PARTICIPATING: | |

ATTORNEYS:

     For the plaintiff-appellant-petitioners, there were briefs by *Kevin J. Palmersheim, Cathleen A. Dettmann* and *Haley Palmersheim, SC* Middleton and oral argument by *Kevin J. Palmersheim.*

     For the defendant-respondent, there was a brief by *Catherine M. Rottier* and *Boardman & Clark, LLP,* Madison, with whom on the brief was *Michael P. May* and *Doran E. Viste*, City of Madison Attorney's Office.  There was an oral argument by *Catherine M. Rottier* and *Paul Norman.*

2017 WI 65

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP2366
(L.C. No. 2014CV180)

STATE OF WISCONSIN          :      IN SUPREME COURT

**Thomas F. Benson, Mark Rechlicz, Mark Rechlicz Enterprises, Inc., Robert J. Muranyi, RJM Pro Golf Incorporation and William J. Scheer,**

         **Plaintiffs-Appellants-Petitioners,**

     **v.**

**City of Madison,**

         **Defendant-Respondent.**

**FILED**

**JUN 22, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1    ANNETTE KINGSLAND ZIEGLER, J.   This is a review of an unpublished decision of the court of appeals, Benson v. City of Madison, No. 2015AP2366, unpublished slip op. (Wis. Ct. App. Aug. 25, 2016), which affirmed the Dane County circuit court's[1] judgment dismissing a lawsuit filed by the petitioners against the City of Madison ("the City") pursuant to the Wisconsin Fair Dealership Law ("the WFDL"), a statute that governs, among other things, the termination or nonrenewal of specified types of

---

[1] The Honorable Richard G. Niess presided.

business relationships.   See generally Wis. Stat. ch. 135 ("Dealership Practices") (2013-14).[2]

¶2   The City owns four public golf courses: Odana, Yahara, Monona, and Glenway.   For years, the City entered into "operating agreements" ("Agreements") with the petitioners, four "golf professionals" ("Golf Pros"), to oversee the clubhouse operations at these courses.[3]   That is, while the City maintained the physical golf courses, the Golf Pros performed varied tasks such as collecting greens fees, hiring and managing attendants, supervising golfing, operating the clubhouse and pro shop, selling concessions, and giving lessons.[4]

¶3   In 2012 the City informed the Golf Pros that it would not be renewing the Agreements.   The Golf Pros subsequently filed a lawsuit against the City, both alleging that the City had failed to comply with the WFDL in ending the City's relationships with them and seeking damages.   The circuit court below ultimately dismissed the lawsuit on summary judgment, concluding that the relationships between the Golf Pros and the

---

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[3] "Golf professional" is an appellation recognized by the Professional Golfers' Association.

[4] Technically speaking, one of the four Agreements at issue in this case was entered into by the City and a corporation owned by one of the Golf Pros.  For simplicity, this opinion will refer to this corporation by its sole shareholder, the Golf Pro.  We also note that a second corporation owned by another of the Golf Pros is a petitioner on this appeal, but we will not reference that entity further.

City did not constitute "dealerships" protected by the WFDL. See Wis. Stat. § 135.02(3).   The Golf Pros appealed, and the court of appeals affirmed.  Benson, unpublished slip op., ¶2.

¶4   On this appeal, we are asked to resolve two principal questions: first, whether the WFDL applies to the City at all; and second, whether the relationships between the Golf Pros and the City are "dealerships" under the WFDL.   Additionally, assuming we answer both questions in the affirmative, the City contends that the Golf Pros' lawsuit is time-barred and should be dismissed on grounds of governmental immunity.

¶5   We conclude that the WFDL applies to the City; that the relationships between the Golf Pros and the City are "dealerships" under the WFDL; that the Golf Pros' lawsuit is not time-barred; and that the City is not immune from the lawsuit. Consequently, we reverse the decision of the court of appeals and remand for further proceedings consistent with this opinion.

## I.  FACTUAL BACKGROUND

¶6   Although the City's relationships with the Golf Pros span back a number of years, the most recent version of the Agreements governed a period running from January 1, 2008, to December 31, 2012.[5]   Because the nature of the relationships between the City and the Golf Pros is central to this case, we first summarize the duties of the City and of the Golf Pros, as

---

[5] The four Golf Pros began their respective relationships with the City in 1977, 1981, 1985, and 1999.  According to the parties, the Agreements "were generally for five-year terms."

3

well as overall financial arrangements, as set forth in these Agreements.

¶7 Each Golf Pro entered into a separate Agreement with the City, with each of the four Golf Pros managing clubhouse operations at one of the City's four courses. The Agreements begin by noting, inter alia, that the City "is engaged in the operation and maintenance of [the golf course] and desires to engage a competent and qualified golf professional to operate, manage, and provide certain services at [the golf course]"; that "the Golf Pro desires to procure from the City the right to operate and provide the services"; and that "the public interest and welfare will be served . . . by the granting of an agreement to a reputable party who will provide certain services to the public patronizing the golf course." The Agreements then grant to each Golf Pro "the exclusive privilege and obligation to operate" one of the four golf courses.

¶8 Pursuant to the Agreements, each Golf Pro was hired to perform the following tasks, among others (some of which overlap):

- "[s]upervise and operate the [golf course] in a clean, efficient, and creditable manner," "manag[e] the speed of play," "efficiently start[] play on the first tee so as to maximize play and revenue to the City," and "provide a ranger/ambassador when heavy play so requires";

- "[e]mploy attendants to sell and collect green fees, resident and non-resident annual passports and other

4

established player promotional devices, renewals, and take and process reservations," and "collect for the City all green fees, locker fees, player promotional pass fees, and tournament fees";

- "operate concession rights at the pro shop, clubhouse, and golf course," "sell food and beverages" during specified periods, "[o]btain the necessary licenses to operate and maintain on the premises a concession operation for the sale of beverages, confections, and food," and "sell golf clothing and golf equipment";

- "[p]rovide a sufficient number of motorized golf carts to meet the needs of the public" and "rent and operate golf carts and equipment"; and

- "teach and give golf lessons for compensation" as well as "conduct" a specified number of "free clinics each season."

¶9 Significantly, the Golf Pros were "responsible for the purchase of all supplies and equipment used in the pro shop, golf range, motorized cart concessions, and food and beverage concessions." Each Golf Pro was entitled to "hire assistants to assist in the operation" of the golf course, "concessions and collecting money due the City under" the Agreement. But the Golf Pros were "responsible for the hiring and supervision of all employees necessary for the efficient operation of the clubhouse and the pro shop and further, the hiring, training, scheduling and supervision of course rangers and starters." The Golf Pros were also "responsible for the salaries, benefits, and

5

premiums for Worker's Compensation and Social Security, all income tax deduction and any other tax or payroll deductions required by law" for these employees.   The Golf Pros were required to maintain a number of different types of insurance.

¶10 The Agreements did not oblige the Golf Pros to maintain the physical courses; this was performed by the City through its own employees.   The City also owned the land and buildings and paid relevant utilities.[6]

¶11  The City paid each Golf Pro a "base contract payment" specified in the Agreements.   The Golf Pros also received:

> All income from concessions, sale of merchandise at the pro shop, golf instruction, pull cart . . . and golf club rental, except for a return each week to the City of Madison fifteen (15%) percent of the gross receipts of pull carts . . . and golf club rental, and eleven (11%) percent of the restaurant concession.[7]

¶12 According to the Agreements, the Golf Pros did not receive any money from the "green fees, locker fees, player promotional pass fees, and tournament fees"; the Golf Pros simply collected these fees and "remit[ted]" them to the City. According to the parties, "the City set the prices for greens

---

[6] The Agreements did provide that the Golf Pros would "cooperate with city employees to keep the premises . . . and the area adjacent to the buildings, up to 25 yards, in a tidy and presentable condition at all times." Additionally, the Golf Pros were "responsible for all cleaning of the clubhouse buildings."

[7] Certain of the Agreements differed regarding the manner in which riding cart and driving range revenue was allocated. This difference does not affect our decision in this case.

fees, passes and locker fees" and furnished "the equipment necessary to process payments of greens fees, locker fees and charges for season passes." On the other hand, the Golf Pros set food, beverage, and merchandise prices.

¶13 The Agreements required the Golf Pros to provide either $1,000 or $3,500 (depending on the Agreement) each year "to a fund to be matched by the City to execute a formal marketing plan for [the City's] golf program." The Agreements state that the Golf Pros "agree[] to participate in the creation of this marketing plan."

¶14 Finally, the Agreements provide that "[t]he relationship between the City and the Golf Pro shall be one of an independent contractor and not one of employer and employee," adding:

> [I]n the operation and conduct of this Agreement, the City does not grant Golf Pro the right to sell or distribute any goods or services provided by the City, nor does the City grant Golf Pro the right to use a City trade name, trademark, service mark, logotype, advertising or other commercial symbol.

¶15 On August 1, 2012——a few months before the expiration of the Agreements——the Golf Pros met with the City's Parks Superintendent ("Superintendent") and other City employees. The Superintendent informed the Golf Pros that "the golf operation was not sustainable" and asked for "proposals for clubhouse operations for the next term of the" Agreements. Proposals were submitted, but on October 8, 2012, the City's mayor decided to "recommend internalizing clubhouse operations" to the City's Common Council. On October 12, 2012, the Superintendent

7

informed the Golf Pros that the Agreements were not going to be renewed.

## II.   PROCEDURAL BACKGROUND

¶16 On October 25, 2012, the Golf Pros served the City with a notice of claim.   See Wis. Stat. § 893.80 ("Claims against governmental bodies or officers, agents or employees; notice of injury; limitation of damages and suits.").   On January 17, 2014, the Golf Pros filed a complaint in Dane County circuit court against the City alleging that the City had failed to comply with the WFDL in terminating the City's relationships with them; the Golf Pros sought damages.   Specifically, the complaint alleged that the City "failed to provide to the Golf Pros any written notice of termination or nonrenewal, let alone a notice that can be said to comply with the requirements" of the WFDL and "failed to provide the Golf Pros with the required 60 days in which to rectify any claimed deficiency," adding that "indeed [the City] claimed no deficiency in the Golf Pros' performance whatsoever." The Golf Pros argued that the City's "nonrenewal and termination of the Golf Pros' respective [Agreements] was a direct violation of the WFDL."[8]

¶17 On August 31, 2015, the circuit court issued a decision and order granting a motion for summary judgment filed by the City and denying a motion for partial summary judgment filed by the Golf Pros.   The decision was based on the circuit

---

[8] On May 19, 2014, the Golf Pros filed an amended complaint.

8

court's conclusion that "[t]he Golf Pros' contractual relationships with the City were not protected 'dealerships' under the [WFDL]." On September 29, 2015, the circuit court entered an order for judgment and judgment of dismissal.

¶18 On November 11, 2015, the Golf Pros filed a notice of appeal. On August 25, 2016, the court of appeals affirmed, "agree[ing] with the circuit court that . . . the Golf Pros did not have dealerships." Benson, unpublished slip op., ¶2. On September 26, 2016, the Golf Pros filed a petition for review in this court. On January 10, 2017, we granted the petition.

## III. STANDARD OF REVIEW

¶19 This appeal arose following the circuit court's decision on summary judgment. "We review summary judgment rulings independently, applying the well-established standards set forth in Wis. Stat. § 802.08." Marks v. Houston Cas. Co., 2016 WI 53, ¶35, 369 Wis. 2d 547, 881 N.W.2d 309 (quoting Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶20, 338 Wis. 2d 761, 809 Wis. 2d 529).

¶20 In this case we interpret and apply the WFDL. "The interpretation and application of a statute present questions of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court." State v. Denny, 2017 WI 17, ¶46, 373 Wis. 2d 390, 891 N.W.2d 144 (quoting State v. Alger, 2015 WI 3, ¶21, 360 Wis. 2d 193, 858 N.W.2d 346).

## IV. ANALYSIS

9

¶21 The WFDL governs "dealerships," which are specially-defined "contract[s] or agreement[s]" entered into between "grantors" and "dealers." Wis. Stat. §§ 135.02-135.025. Generally speaking, where dealerships exist, the WFDL imposes certain obligations on grantors with respect to those relationships. For instance, grantors are prohibited from "terminat[ing], cancel[ling], fail[ing] to renew or substantially chang[ing] the competitive circumstances of a dealership agreement without good cause," Wis. Stat. § 135.03, and usually must provide "at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances." Wis. Stat. § 135.04. If a grantor "violates" the WFDL,

> a dealer may bring an action against such grantor in any court of competent jurisdiction for damages sustained by the dealer as a consequence of the grantor's violation, together with the actual costs of the action, including reasonable actual attorney fees, and the dealer also may be granted injunctive relief against unlawful termination, cancellation, nonrenewal or substantial change of competitive circumstances.

Wis. Stat. § 135.06.

¶22 In this case we are asked to determine whether the WFDL applies to the City, and if so, whether the relationships between the Golf Pros and the City are "dealerships" under the WFDL. We now examine these questions.

A. Whether the WFDL Applies to the City

¶23 To ascertain whether the WFDL applies to the City, we look to the text of the relevant statute. As explained, the

10

WFDL concerns itself with "dealerships," which are entered into between "grantors" and "dealers." The WFDL defines "grantor" to mean "a person who grants a dealership." Wis. Stat. § 135.02(5). "Dealer" is defined to mean "a person who is a grantee of a dealership situated in this state." § 135.02(2). Finally, the statute defines "dealership" in part as follows:

> A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

§ 135.02(3)(a) (emphasis added). Thus, whether the WFDL applies to the City turns on whether the City is a "person" under the WFDL.

¶24 Luckily, "[p]erson" is defined in the WFDL: "a natural person, partnership, joint venture, corporation or other entity." Wis. Stat. § 135.02(6) (emphasis added). We agree with the Golf Pros that the City falls within this definition. The WFDL applies by its terms to "corporation[s]," and the City is a municipal corporation. See, e.g., City of Madison v. Hyland, Hall & Co., 73 Wis. 2d 364, 370, 243 N.W.2d 422 (1976) ("By statute, the City of Madison is 'a body corporate and politic, with powers and privileges of a municipal corporation at common law and conferred by these statutes.' [Wis. Stat.

11

§ 66.019].[9]  This court has repeatedly held that a city is a municipal corporation."); Wis. Stat. § 62.09(7)(a) ("The corporate authority of the city shall be vested in the mayor and common council.").

¶25 This interpretation comports with our oft-repeated rules that "[s]tatutory language is given its common, ordinary, and accepted meaning" and that "[i]f the meaning of the statute is plain, we ordinarily stop the inquiry." State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659). "Without some indication to the contrary, general words (like all words, general or not) are to be accorded their full and fair scope. They are not to be arbitrarily limited. This is the general-terms canon." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) (referring to this rule by its Latin designation, "generalia verba sunt generaliter intelligenda"); see also, e.g., State v. Kozel, 2017 WI 3, ¶39, 373 Wis. 2d 1, 889 N.W.2d 423 ("We will not read into the statute a limitation the plain language does not evidence." (quoting Cty. of Dane v. LIRC, 2009 WI 9, ¶33, 315 Wis. 2d 293, 759 N.W.2d 571)). The general term "corporation" thus presumptively should be read to include more specific types of corporations.

---

[9] Wisconsin Stat. § 66.019 has since been renumbered. See 1999 Wis. Act 150, § 41.

12

¶26 Numerous courts have similarly concluded that statutes referring to "corporations" include within their ambit municipal corporations. See, e.g., Lincoln v. Ricketts, 297 U.S. 373, 373-78 (1936) (section of Bankruptcy Act affected municipal corporations, where the section applied to "person[s]" and "person" was defined to include corporations); Hoye v. United States, 277 F.2d 116, 119 (9th Cir. 1960) (section of Internal Revenue Code defining "person" to include "an officer or employee of a corporation" contemplated municipal corporations because the section made "no distinction in its applicability to different classes of corporations"); Madison Cty. Fiscal Court v. Kentucky Labor Cabinet, 352 S.W.3d 572, 576 (Ky. 2011) (cities were "subject to . . . wage and hour requirements" of statute defining "employer" to include "corporation[s]," because "[a] municipal corporation is a corporation" (second alteration in original)).

¶27 But we need not look beyond Wisconsin for guidance on the question. In Hyland, Hall & Co. we considered "whether cities and counties have standing to sue for treble damages under the Wisconsin antitrust act." Hyland, Hall & Co., 73 Wis. 2d at 367. The City itself was one of the plaintiffs in that case. See id. at 367-68. The relevant statute applied to "person[s]," which was defined to include "corporations." Id. at 369 (quoting then-Wis. Stat. §§ 133.01, 133.04). We noted that we had "repeatedly held that a city is a municipal corporation" and concluded that "cities . . . are 'corporations'

13

within the meaning of" the statute such that the City was "entitled to sue for treble damages." Id. at 370-71.

¶28 In the course of our analysis in that case, we also observed that Wis. Stat. § 990.01 provided as follows:

> Construction of laws; words and phrases. . . . In the construction of Wisconsin laws the words and phrases which follow shall be construed as indicated unless such construction would produce a result inconsistent with the manifest intent of the legislature:
>
> . . . .
>
> (26) Person. "Person" includes all partnerships, associations and bodies politic and corporate.

Id. at 369 (emphasis added) (quoting then-Wis. Stat. § 990.01(26)). Reasoning that a city is a "body politic and corporate," we confirmed that was "no contradiction" between Wis. Stat. § 133.04 and Wis. Stat. § 990.01(26). Id. at 370-71.

¶29 Hyland, Hall & Co. all but disposes of the instant question. As in Hyland, Hall & Co., we are presented with a statute that pertains to "person[s]," defined to include "corporation[s]." As in Hyland, Hall & Co., we have additional guidance from the legislature regarding the definition of the word "person": we should construe that word in the WFDL to include "bodies politic or corporate" "unless such construction would produce a result inconsistent with the manifest intent of

14

the legislature." Wis. Stat. § 990.01(26).[10]  And finally, as in Hyland, Hall & Co., the entity under consideration is the City, a municipal corporation.  One of the only differences between Hyland, Hall & Co. and this case is that the City was a plaintiff in the former but finds itself to be a defendant in the latter.

¶30 "What is of paramount importance is that [the legislature] be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts."  DOJ v. DWD, 2015 WI 114, ¶47, 365 Wis. 2d 694, 875 N.W.2d 545 (alteration in original) (quoting Finley v. United States, 490 U.S. 545, 556 (1989), superseded by statute as stated in Exxon Mobil Corp. v. Allapattah Serv., Inc., 545 U.S. 546, 557-58 (2005)).  It would be peculiar, to say the least, for us to conclude that the City is a "corporation" and a "person" under the relevant statute in Hyland, Hall & Co. but not in this case.  Indeed, Hyland, Hall & Co. and this case both involve chapters of the Wisconsin Statutes——Chapter 133 and Chapter 135, respectively——concerned with the "Regulation of Trade."  See Wis. Stat. (Table of Contents).  The reasoning in Hyland, Hall & Co. applies with equal force here, so we simply apply it.  See DOJ v. DWD, 365

---

[10] Since City of Madison v. Hyland, Hall & Co., 73 Wis. 2d 364, 370, 243 N.W.2d 422 (1976), the definition of "person" in Wis. Stat. § 990.01(26) has been expanded to "include[] all partnerships, associations and bodies politic or corporate." Wis. Stat. § 990.01(26) (emphasis added).

15

Wis. 2d 694, ¶47 (observing that the word "disclose" had been interpreted in a prior case involving a different statute than the one at issue and stating, "[W]e would require a convincing reason indeed to interpret 'disclose' any differently in this context.").

¶31 The noscitur a sociis canon of construction does not change our conclusion. That canon provides that "an unclear statutory term should be understood in the same sense as the words immediately surrounding or coupled with it." Wis. Citizens Concerned for Cranes & Doves v. DNR, 2004 WI 40, ¶40, 270 Wis. 2d 318, 677 N.W.2d 612. For reasons already discussed, the word "corporation" is not unclear, so we have no need to resort to the canon. But even if we did, the words "natural person," "partnership," "joint venture," and "other entity" do not so plainly evidence legislative exclusion of municipal corporations from the meaning of "corporation" that we may conclude that the City falls outside the WFDL.

> A court has no right to resort to the maxim[] of noscitur a sociis . . . for the purpose of reading into a statute a distinction which the legislature neither made nor intended to make. [This] rule[] [is] not the master[] of the courts, but merely their servant[], to aid them in ascertaining the legislative intent. [It] afford[s] a mere suggestion to the judicial mind that, where it clearly appears that the lawmakers were thinking of a particular class of persons or objects, their words of more general description may not have been intended to embrace any other than those within the class.

Boardman v. State, 203 Wis. 173, 176, 233 N.W.2d 556 (1930) (quoting Benson v. Chicago St. P., M. & O. Ry. Co., 77 N.W. 798,

16

799 (1899)); see also, e.g., State v. Quintana, 2008 WI 33, ¶35, 308 Wis. 2d 615, 748 N.W.2d 447 (concluding that the noscitur a sociis canon did not apply because of a lack of similarity between listed terms); cf. Noffke ex rel. Swenson v. Bakke, 2009 WI 10, ¶27, 315 Wis. 2d 350, 760 N.W.2d 156 ("If the legislature intended such a narrow construction, the legislature could have clearly placed such a restriction in the text of the statute.").

¶32  Finally, Wis. Stat. § 135.07 must be considered.  That section, entitled "Nonapplicability," lists certain parties to whom the WFDL does not apply.  See, e.g., Wis. Stat. § 135.07 ("This chapter does not apply: . . . (2) To the insurance business.").  Cities are not among those listed.  Clearly the legislature recognized the need to circumscribe the WFDL in certain circumstances, and we cannot conclude that the possibility that the WFDL might apply to cities is so far-fetched as to have escaped its consideration.  "Under the well-established canon of expressio unius est exclusio alterius (the expression of one thing excludes another), where the legislature specifically enumerates certain exceptions to a statute, we conclude, based on that rule, that the legislature intended to exclude any other exception." State v. Delaney, 2003 WI 9, ¶22, 259 Wis. 2d 77, 658 N.W.2d 416; cf. Lake City Corp. v. City of Mequon, 207 Wis. 2d 155, 171, 558 N.W.2d 100 (1997) ("It is clear that the legislature knew how to accomplish this goal, since it included similar qualifying language in this very same statute.").

17

¶33 In sum, we conclude that the City is a "person" under the WFDL, and that the WFDL therefore applies to it.[11]

### B. Whether the Relationships Between the Golf Pros and the City Are "Dealerships" Under the WFDL

¶34 Having concluded that the WFDL applies to the City, we now address whether the relationships between the Golf Pros and the City are "dealerships" under the WFDL. Whether a relationship constitutes a "dealership" under the WFDL is a recurring question for courts, see Bush v. Nat'l School Studios, Inc., 139 Wis. 2d 635, 646, 407 N.W.2d 883, in part because the definition of "dealership" in the WFDL is "both extremely broad and highly nuanced." Baldewein Co. v. Tri-Clover, Inc., 2000 WI 20, ¶12, 233 Wis. 2d 57, 606 N.W.2d 145. "In most cases, there is rarely an obvious answer to the question of whether a business is a dealership . . . ." Bush, 139 Wis. 2d at 647.

¶35 Again, the WFDL defines "dealership" in part as follows:

---

[11] Consequently, we need not consider whether the City also qualifies as an "other entity" under the WFDL's definition of "person." See Wis. Stat. § 135.02(6). However, we observe that the term "entity" is obviously a broad one. See, e.g., Entity, Black's Law Dictionary 650 (10th ed. 2014) (defining "entity" to mean "[a]n organization (such as a business or governmental unit) that has a legal identity apart from its members or owners" (emphasis added)). And while one might argue that the scope of this term should be limited by the ejusdem generis canon of construction, pursuant to which "general words follow[ing] specific words in the statutory text . . . should be construed in light of the specific words listed," State v. Quintana, 2008 WI 33, ¶27, 308 Wis. 2d 615, 748 N.W.2d 447, application of that canon would require a court to determine first the meaning of the word "corporation" anyway.

18

A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). In determining whether this definition is satisfied, our cases have typically divided the statutory language into three parts: (1) the existence of a contract or agreement between two or more persons; (2) by which a person is granted one of the rights specified; and (3) in which there is the requisite "community of interest." See, e.g., Kania v. Airborne Freight Corp., 99 Wis. 2d 746, 763, 300 N.W.2d 63 (1981).

¶36 In arguing that a dealership existed in this case, the Golf Pros point to Wis. Stat. § 135.025, which states that Chapter 135 "shall be liberally construed and applied to promote its underlying remedial purposes and policies." § 135.025(1). The statute lists the WFDL's "underlying purposes and policies" as follows:

(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

(c) To provide dealers with rights and remedies in addition to those existing by contract or common law;

19

> (d) To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States.

§ 135.025(2). Pursuant to established case law, however, the rule of liberal construction set forth in § 135.025(1) does not, generally speaking, apply to the definition of "dealership":

> If a relationship is a dealership, the protections afforded the dealer are to be construed and applied liberally to the dealer. But the statute itself undertakes to draw a line to encompass the kinds of enterprises and relationships which are to enjoy such protection. There is no basis upon which the courts can provide that protection to enterprises and relationships which fall without the legislative line."

Kania, 99 Wis. 2d at 775 (quoting H. Phillips Co. v. Brown-Forman Distillers Corp., 483 F. Supp. 1289 (W.D. Wis. 1980)); cf. DOJ v. DWD, 365 Wis. 2d 694, ¶31 ("This policy contains the very language we must interpret in this case. We cannot construe the statute liberally in aid of disclosure of information and protection from retaliatory action for disclosure of information until we know what the terms 'disclosure of information' and 'retaliatory action' mean.").

¶37 Returning to the three-part test for the existence of a dealership, we already know that the City, like the Golf Pros, is a "person" under the WFDL. Additionally, the Agreements between the parties are obviously "contract[s] or agreement[s]." Our inquiry thus revolves around whether the other two conditions necessary for the creation of a dealership are satisfied. We examine each in turn, and conclude that a dealership exists.

20

1. The Right to Sell or Distribute Goods or Services

¶38 We conclude that the Agreements between the City and the Golf Pros "granted [the Golf Pros] the right to sell or distribute goods or services." Wis. Stat. § 135.02(3)(a).[12]

¶39 In analyzing this question, the court of appeals below "acknowledge[d] difficulty in identifying whether the Golf Pros were actually selling or distributing any City goods or services and, if so, what those City goods or services were." Benson, unpublished slip op., ¶26.[13] The court of appeals "agree[d] that, at the most abstract level, it might be said that the Golf Pros sold or distributed a City 'service,' namely, the service of providing golf courses for public use." Id. But then the court of appeals concluded:

> [T]he most accurate way to view the unique facts here is that the Golf Pros were <u>not</u> selling or distributing <u>City</u> goods or services; rather, the Golf Pros were engaged in the business of selling or renting <u>non-City goods</u> (golfing equipment, concessions, and pro shop

---

[12] Because we conclude that the Golf Pros were "granted the right to sell or distribute goods or services," we need not determine whether the Golf Pros were likewise "granted the right to . . . use a trade name, trademark, service mark, logotype, advertising or other commercial symbol." Wis. Stat. § 135.02(3)(a).

[13] We assume without deciding for purposes of this case that, as the court of appeals below indicated might be the case under the WFDL, the issue is whether the Golf Pros possess the right to sell or distribute <u>City</u> goods or services rather than, for example, "the right to sell non-City goods and their own services on City property." Benson v. City of Madison, No. 2015AP2366, unpublished slip op., ¶26 n.8 (Wis. Ct. App. Aug. 25, 2016). An argument might be made that either would meet the plain terms of the statute.

21

items) and selling their own professional services to the City and the public, including golf course management services to the City and golf lessons to golf course patrons.

Id. We do not subscribe to this reasoning; the court of appeals' initial conception of the service at issue was closer to the mark.

¶40 In order to make golf courses available to paying members of the public, the City had to do more than merely open up some of its land. It had to perform a number of tasks to create, maintain, and operate its land as golf courses. Producing a golf course and opening it up to the public for use in exchange for money is undoubtedly a service. See Service, Black's Law Dictionary 1576 (10th ed. 2014) (defining "service" as "the performance of some useful act or series of acts for the benefit of another, usu. for a fee").

¶41 The City granted the Golf Pros the right to sell this City service to the public. We have characterized "the right to sell" under the WFDL variously (but not necessarily exhaustively) as the "unqualified authorization to transfer the product at the point and moment of the agreement to sell" or the "authority to commit the grantor to a sale." Foerster, Inc. v. Atlas Metal Parts Co., 105 Wis. 2d 17, 26, 313 N.W.2d 60 (1981). The City granted the Golf Pros authority to commit it to a sale of its service in a number of ways.

¶42 Most importantly, a member of the public seeking to golf on a City course set her reservation through the Golf Pro or the Golf Pro's attendants and paid her greens fee to the Golf

22

Pro or the Golf Pro's attendants.  The City provided "the equipment necessary to process payments of greens fees, locker fees and charges for season passes" and the Golf Pro remitted the resultant revenue to the City.  In this way, the Golf Pros sold access to City courses.

¶43  Similarly, the City required the Golf Pros to operate golf club and cart rental services to those using the City's courses.  The Golf Pros provided the carts and clubs and the money earned from portions of the service was shared between the Golf Pros and the City.

¶44  In some of these instances the Golf Pros set the relevant prices; in others the City set the relevant prices. But in each case the City instituted the service, authorized the Golf Pros to sell that service, and took some or all of the income generated by the service.

¶45  This case is distinguishable from Bakke Chiropractic Clinic v. Physicians Plus Ins. Corp., 215 Wis. 2d 605, 573 N.W.2d 542 (Ct. App. 1997).  That case involved a health maintenance organization insurer which "enter[ed] into provider agreements directly with independent chiropractors and chiropractic clinics"; the providers then provided "services to . . . members" of the insurer.  Bakke, 215 Wis. 2d at 608-09. The court of appeals concluded that the providers in Bakke sold "only their own chiropractic services, to [the insurer] and to others," rather than the insurer's product, which the court of appeals characterized as "health insurance coverage."  Id. at 616.  The court of appeals contrasted this with our decision in

23

Bush. <u>Id.</u> at 615-16. The putative dealer in <u>Bush</u> was a photographer who worked for a "corporation engaged in the school photography business." <u>Bush</u>, 139 Wis. 2d at 637-38. The <u>Bakke</u> court explained that "[e]ven though Bush performed numerous services for [the corporation], all of his efforts were directed toward selling [the corporation's] products and services to the public." <u>Bakke</u>, 215 Wis. 2d at 616.

¶46 This case is more like <u>Bush</u> in this regard than <u>Bakke</u>. In selling access to the City's golf course and renting out carts and clubs, the Golf Pros were selling the City's service of providing a functioning golf course to members of the public. This is not to foreclose the possibility that the Golf Pros were <u>also</u> selling some of their own services to the City. But even if they were doing so, they were simultaneously selling the City's service to the public.[14]

¶47 The City suggests, at least with regard to the collection of greens fees and money for season passes, that the Golf Pros "exercised no more discretion and assumed no more risk in these transactions than a movie theater cashier or parking lot attendant." Assuming this argument is correct, we fail to see exactly what it proves. The WFDL does not provide that every agreement granting a person "the right to sell or

---

[14] We need not examine whether or how other of the many activities performed by the Golf Pros may have contributed to the "sell or distribute" requirement of the WFDL. With regard to some of these activities, like the sale of merchandise, the City received no income.

distribute goods or services" is a dealership; there also must be the requisite community of interest, a subject to which we will turn momentarily.  At present, we simply conclude that the Agreements between the City and the Golf Pros granted the Golf Pros the right to sell or distribute the City's services.

¶48 Before proceeding to the community of interest analysis, we pause to recognize that the Agreements specifically provide that "the City does not grant Golf Pro the right to sell or distribute any goods or services provided by the City."  But Wis. Stat. § 135.025 states that "[t]he effect of this chapter may not be varied by contract or agreement.  Any contract or agreement purporting to do so is void and unenforceable to that extent only."  § 135.025(3).  We are thus required to reject the City's attempt to contract around the WFDL.

## 2.  Community of Interest

¶49 Wisconsin Stat. § 135.02(1) defines "[c]ommunity of interest" as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." § 135.02(1).  We have identified two "guideposts" to be used in analysis of whether a community of interest exists:  a "continuing financial interest," that is, "a shared financial interest in the operation of the dealership or the marketing of a good or service," and "interdependence," or "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship."  Ziegler Co. v. Rexnord, Inc., 139 Wis. 2d 593,

25

604-05, 407 N.W.2d 873 (1987), on reconsideration, 147 Wis. 2d 308, 433 N.W.2d 8 (1988).  In Baldewein Co. we stated:

> When a dealer sinks substantial resources into its relationship with a particular grantor——time, money, employees, facilities, inventory, advertising, training——or derives substantial revenue from the relationship (as a percentage of its total), or some combination of the two, the grantor's power to terminate, cancel, or not renew the relationship becomes a substantial threat to the economic health of the dealer and a community of interest can be said to exist.

Baldewein Co., 233 Wis. 2d 57, ¶27.[15]

---

[15] In the past we have also listed several considerations that are "useful in determining whether a community of interest exists," Central Corp. v. Research Products Corp., 2004 WI 76, ¶34, 272 Wis. 2d 561, 681 N.W.2d 178:

[H]ow long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

(continued)

26

¶50 The undisputed facts establish that there exists a community of interest in the business of selling the City's services, that is, a "continuing financial interest between the [City] and [the Golf Pros] in . . . the operation of the dealership business." Wis. Stat. § 135.02(1).

¶51 To begin with, the record shows that the Golf Pros "[sunk] substantial resources into its relationship with" the City. They were required to hire, train, and compensate employees, purchase "all supplies and equipment" pertaining to the golf carts and golf range, contribute to a marketing plan, and maintain insurance. In addition, the Golf Pros were required to sell food, beverages, and merchandise, which

---

Ziegler Co. v. Rexnord, Inc., 139 Wis. 2d 593, 606, 407 N.W.2d 873 (1987), on reconsideration, 147 Wis. 2d 308, 433 N.W.2d 8 (1988).

Although we have stated that these extrastatutory items "should" be considered by courts, id. at 606, it is more accurate to say that some or all "may" be considered; the factors are meant to be a helpful aid in addressing the overriding community of interest question, not an unwieldy burden. See generally Home Protective Servs., Inc. v. ADT Sec. Servs., Inc., 438 F.3d 716, 719-20 (7th Cir. 2006) (characterizing the list as "long" and attempting to "distill[]" it). It remains true, however, that a court should examine the totality of the relationship between the grantor and the dealer. See Ziegler Co., 139 Wis. 2d at 605-06.

required obtaining both these commodities and any appropriate licenses.[16]

¶52 In <u>Kania</u> we found detrimental to the putative dealer's case the facts that he was "not authorized to sell [the putative grantor's] services" and that he "was paid for his transportation services on a weekly basis at a specified rate"; here, the Golf Pros <u>were</u> authorized to sell the City's services, and while they were paid a retainer by the City, they also shared with the City revenue from the cart and golf club services. <u>Kania</u>, 99 Wis. 2d at 770. The operation of the golf courses "was a joint undertaking of [the Golf Pros] and [the City]. [They] shared in the profitability of the undertaking." <u>Bush</u>, 139 Wis. 2d at 655. The City and the Golf Pros' relationship was a lengthy one, and they shared the duties inherent in maintaining an operative course, "cooperat[ing], coordinat[ing] their activities and shar[ing] common goals in their business relationship." <u>Ziegler Co.</u>, 139 Wis. 2d at 605.

---

[16] While we did not rely on all of these activities for our analysis of whether the Golf Pros had been granted the right to sell or distribute goods or services, the Golf Pros were required to perform these activities as a condition of their arrangements with the City. Consequently, the Golf Pros' significant investment in these activities is relevant to the question of whether "the grantor's power to terminate, cancel, or not renew the relationship [was] a substantial threat to the economic health of the dealer." <u>Baldewein Co. v. Tri-Clover, Inc.</u>, 2000 WI 20, ¶27, 233 Wis. 2d 57, 606 N.W.2d 145. Similarly, insofar as the Golf Pros were selling a City service by providing access to City golf courses, the nature of the Golf Pros' investment in those courses is relevant.

¶53 In sum, the relationships between the Golf Pros and the City fulfill the statutory definition of "community of interest": "a continuing financial interest between the grantor and grantee in . . . the operation of the dealership business." Wis. Stat. § 135.02(1). Given the above, it is more than fair to say that the City's "power to terminate, cancel, or not renew the relationship[s] [was] a substantial threat to the economic health of the [Golf Pros]." Baldewein Co., 233 Wis. 2d 57, ¶27.

## C. Remaining Issues

¶54 We now dispose of the City's remaining arguments. The City argues that the Golf Pros' WFDL claims are time-barred. We disagree. Under Wis. Stat. § 893.93(3)(b), "[a]n action under ch. 135" "shall be commenced within one year after the cause of action accrues or be barred." § 893.93(3)(b). The notice of claim statute, Wis. Stat. § 893.80, increased the applicable period in this case to one year and 120 days. See Colby v. Columbia Cty., 202 Wis. 2d 342, 357, 550 N.W.2d 124 (1996). Next,

> [i]n Wisconsin, a cause of action generally accrues for statute of limitations purposes "'where there exists a claim capable of present enforcement, a suable party against whom it may be enforced, and a party who has a present right to enforce it.'" When a grantor violates the provisions of the WFDL, the dealer is given a claim capable of present enforcement, a suable party in the grantor, and a present right to enforce that claim.

Les Moise, Inc. v. Rossignol Ski Co., Inc., 122 Wis. 2d 51, 57, 361 N.W.2d 653 (1985) (citation omitted) (quoting Barry v. Minahan, 127 Wis. 570, 573, 107 N.W. 488 (1906)).

29

¶55  In Les Moise we considered whether, "where the grantor has terminated the dealer as of a future date and given the dealer written notice of that decision," accrual of a cause of action under the WFDL for termination without good cause, see Wis. Stat. § 135.03, differed from accrual of a cause of action under the WFDL for termination without proper written notice, see Wis. Stat. § 135.04.  Les Moise, 122 Wis. 2d at 60-61.  The suggestion had been made that the former cause of action accrued on the date of termination, whereas the latter cause of action accrued when the written notice was received.  Id.  We concluded that "[w]hen the dealer receives a written termination notice, he may bring an action under sec. 135.03, if the grantor lacked good cause to terminate, or under sec. 135.04, if the written notice did not comply with that provision."  Id. at 61.

¶56  Here, the only notice the Golf Pros received occurred on October 12, 2012, when the Superintendent informed the Golf Pros that the Agreements were not going to be renewed.  This is the earliest date on which their causes of action might have accrued.  The Golf Pros filed their complaint on January 17, 2014, within one year and 120 days of October 12, 2012.  Their claims are not time-barred.

¶57  The City argues that the Golf Pros' causes of actions actually accrued in August 2012 when the Superintendent asked for new proposals because the Golf Pros "knew by [then] that the City would be making significant changes" and that "their five-year contracts would not be renewed on substantially the same terms."  We reject this argument.  In examining this issue, the

30

circuit court below cited our decision in Les Moise, where we explained that "when Les Moise received the written termination notice it was immediately informed of the intention of the grantor and it was immediately capable of determining whether the written notice and termination violated the WFDL." Les Moise, 122 Wis. 2d at 62. In contrast, the facts below demonstrate that as of August 2012 the Golf Pros did not know what the grantor's decision would be and were not capable of assessing whether the City had complied with the WFDL.

¶58 The City also argues that the notice of claim statute does not apply here, thus reducing the Golf Pros' time to file their lawsuit to one year, rather than one year and 120 days. We agree with the Golf Pros that the notice of claim requirements apply under the circumstances of this case.

¶59 As a general rule, the notice of claim requirements govern in "all actions." See City of Racine v. Waste Facility Siting Bd., 216 Wis. 2d 616, 621-24, 575 N.W.2d 712 (1998). However, exceptions to this rule exist. See, e.g. E-Z Roll Off, LLC v. Cty. of Oneida, 2011 WI 71, ¶¶21-22, 335 Wis. 2d 720, 800 N.W.2d 421 (collecting cases). To determine whether an exception exists, we examine whether there is a "a specific statutory scheme in conflict with the notice of claim requirements," whether there is "a legislative preference for a prompt resolution of the type of claim under consideration," and whether "the purposes for which § 893.80 was enacted would be furthered by requiring that a notice of claim be filed." Id.,

31

¶¶23-24, 29 (citing <u>Town of Burke v. City of Madison</u>, 225 Wis. 2d 615, 625, 593 N.W.2d 822 (Ct. App. 1999)).

¶60 These considerations counsel in favor of applying the notice of claim requirements here. The WFDL's statute of limitations period of one year is not "more restrictive . . . than the 120-day notice of claim requirements." <u>Id.</u>, ¶27. Further, although the WFDL allows for injunctive relief, it also permits damages, Wis. Stat. § 135.06, and "[t]he plain meaning of the statute places the choice in the hands of the dealer." <u>Frieburg Farm Equip., Inc. v. Van Dale, Inc.</u>, 978 F.2d 395, 402 (7th Cir. 1992). The Golf Pros do not seek injunctive relief in this case. <u>See</u> <u>E-Z Roll Off</u>, 335 Wis. 2d 720, ¶28. Finally, the twin purposes of the notice of claim requirements, "to give governmental entities the opportunity to investigate and evaluate potential claims" and "to afford governmental entities the opportunity to compromise

and budget for potential settlement or litigation," are well-served in cases like this one.[17]

¶61 The City's final argument is that it is immune from the Golf Pros' lawsuit under Wis. Stat. § 893.80(4). But "[g]overnmental immunity under Wis. Stat. § 893.80(4) applies only to claims based in tort . . . ." Scott v. Savers Property & Cas. Ins. Co., 2003 WI 60, ¶53, 262 Wis. 2d 127, 663 N.W.2d 715 (2003). The City does not develop an argument explaining why a statutory WFDL claim is "based in tort," other than to contend that "the focus is not on the particular legal theory pled" and that the Golf Pros' "claim is based solely on the City's discretionary policy decision to change the operation of its golf courses."

¶62 The mere fact that the City's decision may have been, in the City's words, "a high-level, planning decision that required the exercise of discretion and the weighing and balancing of numerous factors inherent in governmental decision-

---

[17] We note that in most lawsuits it is the plaintiff seeking exemption from the notice of claim requirements; here, the City seeks exemption in order to shorten the applicable limitations period. See, e.g., E-Z Roll Off, LLC v. Cty. of Oneida, 2011 WI 71, ¶23, 335 Wis. 2d 720, 800 N.W.2d 421 (framing one part of the three-part inquiry used in determining whether an exception to the notice of claim requirements exists as "whether there is a specific statutory scheme for which the plaintiff seeks exemption" (emphasis added) (citing Town of Burke v. City of Madison, 225 Wis. 2d 615, 625, 593 N.W.2d 822 (Ct. App. 1999)). We need not and do not express an opinion on a threshold question of whether an entity like the City is permitted to argue that it should not have been given notice of a claim, because the argument fails in this case anyway.

making" does not establish the City's right to immunity. Cf., e.g., Energy Complexes, Inc. v. Eau Claire Cty., 152 Wis. 2d 453, 464, 449 N.W.2d 35 (1989) ("We conclude that neither the common law nor [Wis. Stat. §] 893.80(4) . . . immunize the County from ECI's breach of contract lawsuit, even if the contract was terminated because of legislative acts occurring after the contract was signed."). Without more, we conclude that the City is not immune from suit.

## V. CONCLUSION

¶63 We conclude that the WFDL applies to the City; that the relationships between the Golf Pros and the City are "dealerships" under the WFDL; that the Golf Pros' lawsuit is not time-barred; and that the City is not immune from the lawsuit. Consequently, we reverse the decision of the court of appeals and remand for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶64 DANIEL KELLY, J. *(concurring).* I join the court's opinion but for one persnickety point——our analysis treated a certain piece of evidence in the wrong part of the dealership analysis. As our opinion accurately observes, a dealership is (as relevant here) a "contract or agreement . . . between 2 or more persons, by which a person is granted the right to sell or distribute goods or services . . . in which there is a community of interest in the business of . . . selling . . . goods or services . . . ." Wis. Stat. § 135.02(3)(a).

¶65 This case requires us to address both the "selling goods or services" and the "community of interest" elements of the definition of a dealership. The first element inquires into the relationship between the parties as it relates to the sale of goods or services. Contracts described by this element are those in which "a person is granted the right to sell or distribute goods or services . . . ." Wis. Stat. § 135.02(3)(a). Although the operative part of this phrase appears in the passive voice ("is granted"), we know the "granting" party is the City of Madison. Thus, the "person" to whom the phrase refers must be the Golf Pros. It necessarily follows, then, that the goods or services to which this element applies must belong to the grantor (because a grantee need not grant itself rights in its own property, and a grantor may not grant rights in something it does not own).

¶66 So if the contracts under consideration created dealerships, they must have conferred on the Golf Pros the right

1

to sell goods or services belonging to the City. Our opinion correctly concludes they did——we said the contracts were selling access to the City's golf courses. That is certainly a service, and a particularly welcome one at that. See Majority op., ¶¶40-41.

¶67 Our analysis of this dealership element should have stopped there. Instead, we proceeded to address the contracts' requirement that the Golf Pros provide golf club and cart rental services to the City's golfers. But the clubs and carts belong to the Golf Pros, not the City. So the "goods or services" element of the dealership statute simply has nothing to say about them. They do, however, belong in the "community of interest" element of the analysis, which our opinion deftly handles, and so I need say no more.

¶68 For this reason, I concur.

¶69 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* The dispositive issue is whether the City of Madison is a "person" in the Wisconsin Fair Dealership Law. If it is not, the Law is not applicable to municipalities.[1]

¶70 This case is one of first impression. Neither the parties, the majority, nor I could find any reported case, either in Wisconsin or in any of the other many states with similar dealership statutes, holding that a municipality is subject to the statute. I would affirm the judgment of the circuit court and the decision of the court of appeals, but on the ground that that the Fair Dealership Law does not apply to the City of Madison.

¶71 The majority opinion's ruling that the City of Madison is a "person" in the Law does not follow or provide clear

---

[1] I therefore need not and do not address the stretch the majority opinion makes to fit the instant case into the Wisconsin Fair Dealership Law.

The word "dealership" is used instead of "franchise" in the Wisconsin Fair Dealership Law to avoid confusion between the Dealership Law and the Wisconsin Franchise Investment Law, Wis. Stat. ch. 553. Foerster, Inc. v. Atlas Metal Parts Co., 105 Wis. 2d 17, 23-24, 313 N.W.2d 60 (1981). For an historical recount of the circumstances leading up to the enactment of the Fair Dealership Law, see Robert B. Corris, In the Trenches: OPEC, Gas Lines, and the Wisconsin Fair Dealership Law, Wis. Lawyer, Apr. 1999, at 25.

The word "franchise" also has a special meaning in municipal law. See 12 Eugene McQuillin, The Law of Municipal Corporations ch. 34 (3d ed. 1995). The word franchise is often used in municipal law to refer to a municipality entering into an agreement with a utility company enabling the utility to use property owned by the municipality.

interpretive rules[2] and has, I think, widespread ramifications for all municipalities in this state and the many contracts on diverse topics to which they are parties.  Municipalities will be limited with regard to managing their finances and their contracts.  The majority opinion has not considered these ramifications.[3]

¶72  The Wisconsin Fair Dealership Law, Wis. Stat. § 135.02(5) and (6), defines "<u>grantor</u>" under the Law as a "<u>person</u>" to whom the Law applies.  It further defines "person" as a <u>natural person, partnership, joint venture, corporation, or other entity</u>.  The legislature has not referenced "a municipality" or any governmental entity in the definition of "person" for purposes of the Dealership Law:

> **Wis. Stat. 135.02.**  Definitions.  In this chapter [135]:
>
> . . . .
>
> (5) "Grantor" means a person who grants a dealership.
>
> (6)"Person" means a natural person, partnership, joint venture, corporation or other entity.

¶73  Although rules of interpretation serve the court, they are not absolute rulers of a court's interpretation.  <u>Boardman</u>

---

[2] <u>See</u> majority op., ¶30 (The legislature should "'be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts.'") (quoted source omitted).

[3] Consequences are an important consideration in interpreting a statute.  If an interpretation results in "unreasonable or absurd" consequences, that interpretation may be rejected.  <u>Wisconsin Carry, Inc. v. City of Madison</u>, 2017 WI 19, ¶20, 373 Wis. 2d 543, 892 N.W.2d 233 (2017).

v. State, 203 Wis. 173, 233 N.W. 556 (1930) (quoting Benson v. Chicago, St. P., M. & O. Ry. Co., 77 N.W. 798, 799 (Minn. 1899)). Nevertheless, numerous interpretive rules point to the conclusion that a municipality does not fall within the definition of "person" under the Fair Dealership Law.

¶74 Applying these rules and looking to other factors, I conclude that the City of Madison does not fall within the definition of "person" in the Wisconsin Fair Dealership Law.

¶75 First, the Legislature's instructions to the court in deciding whether a statute governs a municipality make clear that the Fair Dealership Law should not be interpreted as applying to a city.

¶76 The legislature has clearly and explicitly stated that the powers conferred on cities "shall be limited only by express language." Wis. Stat. § 62.11(5).[4] Included among the powers conferred on a city is "the management and control of the city property." Wis. Stat. § 62.11(5).[5] The golf courses at issue are the property of the City of Madison.

¶77 In addition to the power to manage its property, the City of Madison is also statutorily authorized to own, operate,

---

[4] See Wis. Stat. § 61.34(1) for the same provision relating to village powers.

[5] The court has stated that "[t]he City of Madison possesses the broad home rule powers outlined by Wis. Stat. § 62.11(5) and Article XI, Section 3 of the Wisconsin Constitution. This power allows the City to act for the 'health, safety, and welfare of the public,' and to carry out its policy goals by 'license, regulation, suppression . . . and other necessary or convenient means.'" Eichenseer v. Madison-Dane County Tavern League, Inc., 2008 WI 38, ¶49, 308 Wis. 2d 684, 748 N.W.2d 154.

3

and finance parks and golf links. See Wis. Stat. § 66.0621(2). The City of Madison has adopted an ordinance creating a golf subcommittee of the Board of Park Commissioners. The subcommittee "[a]dvises the Commission regarding policies, rate structure, rules and regulations, capital improvements, user complaints, operations and the selection of golf pros." See Madison, Wis. General Ordinances § 33.05(5)(a).

¶78 The Fair Dealership Law does not contain any express language limiting a city's power to contract about the management and control of its golf links. No other law is cited as expressly limiting the City in the operation of its golf links.

¶79 In addition to these powers, the city council "shall have power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public . . . ." Wis. Stat. § 62.11(5).

¶80 The legislature has mandated that a city's powers "shall be liberally construed in favor of the rights, powers and privileges of cities to promote the general welfare, peace, good order and prosperity of such cities and the inhabitants thereof." Wis. Stat. § 62.04.

¶81 According to these statutes, the City of Madison has the power——which is to be liberally interpreted——to manage its property, operate golf links, and to act for the good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public.

4

¶82 And the legislature has clearly and explicitly stated that the powers conferred on cities "shall be limited only by express language." Wis. Stat. § 62.11(5).

¶83 The majority opinion ought to follow the legislature's instructions in Wis. Stat. § 62.11(5): It ought to interpret the Dealership Law as not limiting the powers of the City of Madison because nothing in the Fair Dealership Law expressly limits the City of Madison in exercising management over its golf courses or expressly limits the City's power to act for the good order of the city, its commercial benefit, or for the health, safety, and welfare of the public with regard to its golf courses.

¶84 Applying the legislative instructions in § 62.11(5) to the instant case, I conclude that the City of Madison does not fall within the definition of the word "person" in the Fair Dealership Law.

¶85 Second, the interpretive rule denominated "statutes in derogation of sovereignty" supports the legislature's instructions that the powers conferred on cities "shall be limited only by express language." Under this interpretive rule, applicable to all subdivisions of government, any statutory provision that is susceptible to being read as applying to a governmental entity and to a private entity should be read as not applying to the governmental entity absent other

5

indicia supporting a contrary result.[6] This rule is premised on the policy of preserving for the public the efficient functioning of government.[7]

¶86 This rule of statutory interpretation has been applied in Wisconsin cases. See, e.g., State ex rel. Martin v. Reis, 230 Wis. 683, 687, 284 N.W. 580 (1939) (When the legislative intent is to "include the state or any of its political subdivisions, it is explicitly so stated in the definition. . . . It is universally held both in this country and in England that such statutes do not apply to the state unless the state is explicitly included by appropriate language."); Sullivan v. School Dist. No. 1 of City of Tomah, 179 Wis. 502, 506-07, 509-10, 191 N.W. 1020 (1923) ("Legislation in derogation of the common law should be strictly construed most favorably to the public corporation and not to the claimant for damages. . . . [G]eneral statutes are not to be construed to include, to its hurt, the sovereign. . . . [Application of a statute to a political subdivision] is a matter which rests with the wisdom of the Legislature, and not with the courts, and until such change is effected by a proper statute, we must consider it our duty to adhere to our former decisions and to pronounce in favor of the nonliability doctrine.").

---

[6] 3 Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 62.1, at 377-82 (7th ed. 2014).

[7] 3 Singer, supra note 6, § 62.1, at 377-82.

¶87 Applying this interpretive rule to the instant case, I conclude that the City of Madison does not fall within the definition of the word "person" in the Fair Dealership Law.

¶88 Third, in addition to the two interpretive rules described above supporting the conclusion that the City of Madison is not governed by the Fair Dealership Law, another similar rule of statutory interpretation "long followed"[8] and "generally applied"[9] in Wisconsin law validates the conclusion that the City of Madison does not fall within the definition of "person," namely the "presumption of inapplicability."

¶89 The court has adopted the "presumption of inapplicability" as an interpretive aid. Statutory provisions that do not explicitly govern governmental entities do not apply to governmental entities:

> Statutory provisions which are written in such general language as to make them reasonably susceptible to being construed as applicable alike both to the government and to private parties are subject to a presumptive rule of construction which exempts the government from their operation in the absence of other particular indicia supporting a contrary result in particular instances.

Wis. Veterans Home v. Div. of Nursing Home Forfeiture Appeals, 104 Wis. 2d 106, 110, 310 N.W.2d 646 (Ct. App. 1981) (quoting 3

---

[8] Wis. Veterans Home v. Div. of Nursing Home Forfeiture Appeals, 104 Wis. 2d 106, 110, 310 N.W.2d 646 (Ct. App. 1981)

[9] DNR v. City of Waukesha, 184 Wis. 2d 178, 194, 515 N.W.2d 888 (1994), abrogated on other grounds by State ex rel. Auchinleck v. Town of LaGrange, 200 Wis. 2d 585, 547 N.W.2d 587 (1996).

7

Sands, Statutes and Statutory Construction § 62.01, at 63 (4th ed. 1974)).[10]

¶90 Although Wisconsin cases rely on this "presumption of inapplicability," the cases acknowledge, as do I, that this presumption may be overcome.

¶91 The presumption may be overcome when (1) the statute's objective "could not be accomplished without including the government"; or (2) including a particular activity under the statute "would not vitally interfere with the processes of government."[11]

¶92 The Golf Pros have not overcome the presumption of the inapplicability of the Fair Dealership Law to the City of Madison. The objectives of the Law can be accomplished without including the City of Madison as a "person" in the Law. Including the City as a "person" in the Law vitally interferes with the City's managing recreational facilities and the fiscal policies of the City.

¶93 Applying this "presumption of inapplicability" in the instant case, I conclude that the City of Madison does not fall within the definition of the word "person" in the Fair Dealership Law.

---

[10] For a nearly identical statement in a more recent version of Sands, see 3 Singer, supra note 6, § 62.1, at 377-78.

[11] Town of Janesville v. Rock Cty., 153 Wis. 2d 538, 542-44, 451 N.W.2d 436 (Ct. App. 1989); DNR v. City of Waukesha, 184 Wis. 2d 178, 194-95, 515 N.W.2d 888 (1994), overruled in part by State ex rel. Auchinleck v. Town of Grange, 200 Wis. 2d 585, 597, 547 N.W.2d 587 (1996).

¶94 Fourth, the legislature has not defined "person" for the Fair Dealership Law. When the legislature wants the word "person" to mean a governmental body, it knows how to write such a definition. When the legislature wants to govern a governmental body, it has included one or more words in the enumeration of "person" conveying that meaning. Yet, the legislature did not refer to a governmental body in the definition of "person" in the Fair Dealership Law.

¶95 The legislature often defines words exclusively and distinctively for particular statutory enactments.[12] "[S]pecially-defined words or phrases are given their technical or special definitional meaning."[13]

¶96 For example, the Wisconsin antitrust law unequivocally defines "person" for purposes of that law to include "individuals, the state and all its political subdivisions, all counties, cities, villages, towns, school districts, governmental agencies and bodies politic and corporate, and all corporations . . . . " Wis. Stat. § 133.02(3).

---

[12] See, e.g., State v. Neumann, 2013 WI 58, ¶73, 348 Wis. 2d 455, 832 N.W.2d 560 ("The word 'recklessly' is defined differently in the second-degree reckless homicide statute (Wis. Stat. § 939.24(1)) and in the criminal child abuse statute § 948.03(1)), resulting in requiring different mens rea.").

[13] DOJ v. DWD, 2015 WI 114, ¶22, 365 Wis. 2d 694, 875 N.W.2d 545 (citation omitted). See also Bruno v. Milwaukee Cty., 2003 WI 28, ¶8, 260 Wis. 2d 633, 660 N.W.2d 656 ("We have 'long recognized that when a court construes an ordinance or statute, words must be given their common meaning.' It is also 'well established that technical words or phrases with a peculiar meaning in the law must be construed according to such meaning.'") (quoted sources omitted).

¶97 The Fair Dealership Law unequivocally defines "person" for purposes of the Fair Dealership Law. Unlike in the antitrust act, the definition of the word "person" in the Fair Dealership Law does not refer to a "governmental agency," a "municipal corporation," a "body politic," a "municipality," a "county," a "city," a "town," a "school district," a "political subdivision," or similar words referring to a governmental body.

¶98 In Wis. Stat. § 990.01(26), the legislature defines "person" as including "all partnerships, associations and bodies politic or corporate." This definition applies to the interpretation of Wisconsin laws "unless such construction would produce a result inconsistent with the manifest intent of the legislature." The legislature has manifested its intent that this definition of "person" in § 990.01(26) does not apply in the instant case; the legislative special definition of "person" in the Fair Dealership Law is inconsistent with the definition of "person" in § 990.01(26). The special definition of "person" in the Fair Dealership Law controls. It does not reference "body politic."

¶99 This court has stated numerous times that the plain meaning of the statutory text is the controlling interpretive rule in this court. This court assumes that the legislature says what it means and means what it says. Heritage Farms, Inc. v. Markel Ins. Co., 2009 WI 27, ¶14 n.9, 316 Wis. 2d 47, 762 N.W.2d 652 (stating that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there;" "every word excluded from a statute must be

10

presumed to have been excluded for a purpose") (citations omitted); Umansky v. ABC Ins. Co., 2009 WI 82, ¶102, 319 Wis. 2d 622, 769 N.W.2d 1 (Ziegler, J., dissenting) (same); See also Ball v. Dist. No. 4, Area Bd. of Vocational, Technical & Adult Educ., 117 Wis. 2d 529, 539, 345 N.W.2d 389 (1984) ("The . . . presumption is that the legislature chose its terms carefully and precisely to express its meaning.").

¶100 Applying this interpretive rule in the instant case, I conclude that the City of Madison does not fall within the definition of the word "person" in the Dealership Law.

¶101 Fifth, the City is not a "corporation" in the definition of "person" under the Fair Dealership Law. The word "corporation" is not defined in the Fair Dealership Law.

¶102 The majority opinion proffers four cases to support its conclusion that the City of Madison is a "corporation" under the definition of "person" in the Wisconsin Fair Dealership Law. None of the cases interprets the words "person" or "corporation" in the context of the Fair Dealership Law.

¶103 Three of the four cases are not Wisconsin cases. Each of these non-Wisconsin cases involved a different federal or state statute, and in no statute did the statutory definition of "corporation" include a local political subdivision. None of these non-Wisconsin cases defines "person" as "person" is defined in the Wisconsin Fair Dealership Law.

¶104 In each of these three cases the court examined the definition of the word "corporation," the context of the definition, the purpose of the statute, and the operation of the

11

statute. See City of Lincoln v. Ricketts, 297 U.S. 373 (1936); Hoye v. United States, 277 F.2d 116 (9th Cir. 1960); Madison Cty. Fiscal Court v. Kentucky Labor Cabinet, 352 S.W.3d 572 (Ky. 2011). In each case the court concluded that the legislature intended the word "corporation" to include the political subdivision at issue.

¶105 That said, these cases neither support the majority opinion's view that the word "corporation" in the Fair Dealership Law includes the City of Madison nor undercut my conclusion that the word "corporation" does not include the City of Madison. Rather, these three non-Wisconsin cases stand for the unremarkable proposition that in some instances, legislation included a governmental entity within the word "corporation."

¶106 The majority opinion seems to champion the notion that every time the word "corporation" is used in a statute it refers to a municipal corporation. If this is the majority opinion's claim, it is wrong. If, however, the majority opinion claims that in some statutes the word "corporation" may be interpreted to include a municipal corporation, this claim is supported by the three non-Wisconsin cases.

¶107 Indisputably, the City of Madison is sometimes referred to as a municipal corporation. But the question in the instant case is whether a municipal corporation is a "corporation" within the meaning of the word "corporation" in a particular statute.

¶108 The particular statute in the instant case is the Fair Dealership Law, and the question presented is: Does the word

12

"corporation" in the definition of "person" in the Law include a municipal corporation?

¶109 The fourth case that the majority opinion relies on, City of Madison v. Hyland, Hall & Co., 73 Wis. 2d 364, 243 N.W.2d 422 (1976), relates to yet a different statute, the Wisconsin antitrust act. In its discussion of Hyland, Hall & Co., the majority opinion continues what appears to be a misguided attempt to demonstrate that municipal corporations fall within the word "corporation" every time a statute uses the word "corporation."

¶110 In Hyland, Hall & Co., the City of Madison (in its capacity as a City and school district) sued a private corporation under the Wisconsin antitrust act for damages for fixing bids on plumbing contracts. At the time, Wis. Stat. § 133.01 provided that "any . . . person, corporation, copartnership, trustee or association" shall be liable "to any person transacting or doing business in this state" for treble damages for violating the Act. Section 133.04 of the act stated that the word "person" "shall be deemed to include, besides individuals, corporations, partnerships and associations existing under or authorized by the laws of the United States, any of the territories, of this or any other state or any other state . . . ."

¶111 The defendants in Hyland, Hall & Co. argued that the City of Madison was not a person within the definition of Wis. Stat. § 133.04 and was not entitled to seek treble damages under

13

the antitrust act.  The court rebuffed the defendant's position on several grounds.

¶112 Quoting Wis. Stat. § 66.019, the court noted that the city is "a body corporate and politic, with powers and privileges of a municipal corporation at common law and conferred by these statutes."  The court then read Wis. Stat. §§ 133.04 and 990.01(26) together and concluded that the City was a person (that is, a corporation existing under Wisconsin law) that could be a plaintiff in an antitrust suit.  At the time Hyland, Hall & Co. was decided, § 990.01 stated that "'person' includes all partnerships, associations and bodies politic and corporate."  The court's brief discussion of why these two provisions were to be read together is, in my opinion, garbled and hard to understand.

¶113 Perhaps that is why the Hyland, Hall & Co. decision did not rely on this reasoning alone.  The court went on to explain in Hyland, Hall & Co. that the interpretation of the Wisconsin antitrust act was governed by the interpretation of the federal Sherman Act.  Under the Sherman Act, the civil remedy of treble damages had been afforded to a municipality. Hyland, Hall & Co., 73 Wis. 2d at 375.  Thus, the court interpreted the Wisconsin statute as affording the City a civil remedy of treble damages.

¶114 The Hyland, Hall & Co. court did not, however, decide whether the City would be subject to a treble-damage judgment if it were a defendant (rather than a plaintiff) in an antitrust case.  The court explicitly acknowledged that the words "person"

14

and "corporation" in the antitrust act might have different meanings depending on whether the City was a plaintiff or defendant in an antitrust suit.  Hyland, Hall & Co., 73 Wis. 2d at 375.[14]  According to the court, "the right to sue for treble damages and liability to suit are not necessarily reciprocal." Hyland, Hall & Co., 73 Wis. 2d at 376.

¶115 Hyland, Hall & Co. is not on all fours and does not govern the instant case.  Hyland, Hall & Co. involves a different statute and different definitions than those in the instant case, and the antitrust Act and the Fair Dealership Law serve different purposes.  Hyland, Hall & Co. stands for the unremarkable, well-accepted proposition that the words "person" and "corporation" can have different meanings in different statutes.

¶116 The persuasiveness of the four cases the majority opinion cites is significantly undermined by the general rule that the legislature can ascribe different meanings to the same word in different statutes (and sometimes even in the same statute).

---

[14] "'Most words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section.' . . . A given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.  The point is the same even when the terms share a common statutory definition . . . ." Envtl. Defense v. Duke Energy Corp., 549 U.S. 561, 574 (2007).

¶117 I conclude that the City of Madison does not fall within the definition of the word "corporation" in the definition of "person" in the Fair Dealership Law.

¶118 Sixth, the City does not fall within the phrase "other entity" in the definition of "person" under the Dealership Law. The phrase "other entity" can signify a wide variety of entities. There is no legislative history supporting the conclusion that "other entities" in the Fair Dealership Law refers to municipal corporations.

¶119 The ejusdem generis canon of interpretation, a variation of the maxim noscitur a sociis, is helpful in interpreting the phrase "other entity" in the instant case.[15]

¶120 Ejusdem generis applies when general words (for example, "other entity" in the instant case) follow specific words enumerated in a statutory list.[16]

¶121 The canon advises that the general words "other entities" are interpreted to embrace only bodies similar in nature to those enumerated by the preceding specific words. The entities enumerated in Wis. Stat. § 135.02(6) are set forth in terms of entities conducting business or commerce.

---

[15] 2A Singer, supra note 6, § 47:17, at 364-65. The majority opinion refers to "noscitur a sociis."

[16] 2A Singer, supra note 6, § 47:17 at 364-65.

For further discussion of the ejusdem generis canon, see La Barge v. State, 74 Wis. 2d 327, 332-34, 246 N.W.2d 794 (1976).

The doctrine of ejusdem generis is inapplicable if the text has a clear, plain and reasonable meaning on its face. State v. Peters, 2003 WI 88, ¶14, 263 Wis. 2d 475, 665 N.W.2d 171.

16

¶122 The Golf Pros in effect assert that inasmuch as the entities enumerated as "persons" conduct business and commerce, the City of Madison can and should be bound by the Fair Dealership Law when it engages in business and commerce as a de facto private enterprise. The Golf Pros argue that the City should be held to the same standard as any private golf course operation under the Fair Dealership Law.

¶123 But a municipality, in contrast to a private entity, does not engage in business or commerce for the purpose of profit or revenue. A municipality's power is limited to engaging in activities in furtherance of its powers and in furtherance of the public interest. In the instant case, the City has the express power to operate golf links. Although the City of Madison operates golf links that might have belonged to and been operated by a private entity, the City is not necessarily treated under the law in the same way as a private enterprise operating golf links.[17]

¶124 Applying the interpretive canon of ejusdem generis in the instant case, I conclude that the City of Madison does not fall within the definition of "other entity" and does not fall within the definition of the word "person" in the Dealership Law.

---

[17] See Wisconsin Carry, Inc. v. City of Madison, 2017 WI 19, 373 Wis. 2d 543, 892 N.W.2d 233 (2017) (a city operating a bus enterprise is not treated the same as a private enterprise operating a bus service).

17

¶125 Seventh, the majority opinion errs in relying on Wis. Stat. § 135.07 and the canon expressio unius est exclusio alterius (the expression of one thing excludes another) to conclude that the City of Madison falls within the definition of "person" within the Fair Dealership Law.[18] See majority op., ¶32.

¶126 In Wis. Stat. § 135.07, the legislature excluded three specified entities from the application of the Fair Dealership Law. This statute provides as follows:

> **135.07    Nonapplicability.**    This chapter does not apply:
>
> **(1)** To a dealership to which a motor vehicle dealer or motor vehicle distributor or wholesaler as defined in s. 218.0101 is a party in such capacity.
>
> **(2)** To the insurance business.
>
> **(3)** Where goods or services are marketed by a dealership on a door to door basis.

¶127 The majority opinion asserts that when the legislature expressly excludes something from a statute it does not intend to exclude anything else.[19] Majority op., ¶32. Thus, asserts the majority opinion, because Wis. Stat. § 135.07 creates only three exceptions to the Fair Dealership Law, the legislature intended no other exceptions. Applying the canon to § 135.07,

---

[18] The Golf Pros cite Caflisch v. Staum, 2000 WI App 113, ¶13, 235 Wis. 2d 210, 612 N.W.2d 385, for the expression of the expressio unius est exclusio alterius canon: "When the legislature provides a finite list of exceptions to a general rule, [courts] presume that the legislature did not intend other exceptions."

[19] See 2A Singer, supra note 6, § 47:23, at 406-13.

18

the majority opinion concludes that because the City is not excepted as one of the three statutory exceptions, the City is not excepted from the Fair Dealership Law.[20]

¶128 A canon may be overcome by a strong indication of contrary legislative intent.  And a contrary legislative intent is strong in the instant case.

¶129 The three excepted entities clearly fall within the statutory definition of "person" to which the Fair Dealership Law is applicable:  a motor vehicle dealership, the insurance business, and door-to-door dealerships.  This section excludes three "persons" to which the Fair Dealership Law would otherwise apply.  Section 135.07 does not exclude these three entities from the definition of "persons."

¶130 In contrast, the City of Madison does not fall within the statutory definition of "person" to which the Fair Dealership Law is applicable.  Therefore the legislature did not have to exclude the City of Madison from the application of the Fair Dealership Law in Wis. Stat. § 135.07.

¶131 Accordingly, applying the text of Wis. Stat. § 135.07 and the canon, I conclude that the City of Madison does not fall within the definition of "person" under the Fair Dealership Law.

¶132 Eighth, the legislative declaration that the Fair Dealership Law be "liberally construed and applied to promote its underlying remedial purposes and policies," Wis. Stat.

---

[20] See Foster v. State, 70 Wis. 2d 12, 20, 233 N.W.2d 411 (1975) (this "statute stops with the single exception it creates").

19

§ 135.025(1), does not mean that the boundaries of coverage of the Law are to be construed extensively.[21] Moreover, the court places heavy emphasis on the right of free contract, declaring that "the right of free contract is a property right protected by both state and federal constitutions and should not be lightly impaired." Kania v. Airborne Freight Corp., 99 Wis. 2d 746, 774-75, 300 N.W.2d 63 (1981).

¶133 Ninth and finally. No case has been cited, and I could not find any, applying a dealership statute to a governmental entity.

¶134 More than 20 states apparently have statutes similar to the Wisconsin Fair Dealership Law. Gary W. Leydig, Survey of State Dealer Laws at 3 n.11, http://www.leydiglaw.com/userfiles/file/survey%20of%20state%20dealer%20laws.pdf. According to Leydig's survey, the Wisconsin Fair Dealership Law, enacted in 1973, is "one of the oldest and most litigated dealership statutes on the books." The Wisconsin Fair Dealership Law has served as a reference for other states in interpreting and applying their own statutes. See Leydig, Survey of State Dealer Laws at 5.

---

[21] This court has given a narrow interpretation of the legislature's instruction to give a statute a "liberal interpretation construction." See, e.g., DOJ v. DWD, 2015 WI 114, ¶¶30-34, 365 Wis. 2d 694, 875 N.W.2d 545.

The Fair Dealership Law's liberal construction rule does not apply to whether the Law applies to a particular contract in the first instance. See H. Phillips Co., Inc. v. Brown-Forman Distillers Corp., 483 F. Supp. 1289, 1291 (W.D. Wis. 1980).

¶135 Using WestLaw, I searched cases in many states and I could find no reported cases in these jurisdictions that apply the dealership statutes to a contract between a governmental entity and a private entity. This lack of any cases is persuasive that the dealership statutes are not applicable to political subdivisions.

\* \* \* \*

¶136 The majority opinion forsakes the usual rules of statutory interpretation in deciphering the meaning of the word "person" in the Wisconsin Fair Dealership Law. Its analysis neglects to address the relationship of the Dealership Law, municipal constitutional and statutory home rule, and other statutes governing governmental entities. Its weak analysis inevitably leads the majority opinion to the wrong conclusion. And I am concerned, as I stated previously, that the majority opinion has not considered the consequences of its interpretation of the word "person" and that it is establishing a far-reaching precedent that will produce unreasonable results.[22]

¶137 For the reasons I have set forth, I write in dissent. I conclude that the City of Madison does not fall within the definition of "person" for the purposes of Wis. Stat. chapter 135.

---

[22] See Anderson v. Aul, 2015 WI 19, ¶114, 361 Wis. 2d 63, 862 N.W.2d 304 (Ziegler, J., concurring) (asserting that the plain meaning analysis includes consideration of consequences of alternative interpretations to avoid unreasonable results).

¶138 Accordingly, I would affirm the judgment of the circuit court and the decision of the court of appeals but on the ground that the Fair Dealership Law does not apply to the City of Madison.

¶139 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.